2000 OK CR 2

**Rocky Eugene DODD, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–97–26.**

Court of Criminal Appeals of Oklahoma.

Jan. 6, 2000.

Bert Richard, Benjamin Brown, Patrick J. Ehlers, Assistant Public Defenders, Oklahoma City, for Plaintiff at trial.

Susan Caswell, Cassandra Williams, Assistant District Attorneys, Oklahoma City, for the State at trial.

Carolyn L. Merritt, Assistant Public Defender, Oklahoma City, for Appellant on appeal.

W.A. Drew Edmonson, Attorney General of Oklahoma, William L. Humes, Assistant

Attorney General, Oklahoma City, for Appellee on appeal.

## OPINION

JOHNSON, Judge:

¶1 Rocky Eugene Dodd, Appellant, was tried by a jury in the District Court of Oklahoma County, Case No. CF–94–7724, before the Honorable Nancy L. Coats. Dodd was convicted of two counts of First Degree Malice Aforethought Murder, in violation of 21 O.S.1991, § 701.7. After finding the existence of three aggravating circumstances for Count I and four aggravating circumstances for Count II, the jury set punishment at death for each murder conviction.[1] The trial court sentenced Dodd accordingly. Dodd now appeals.

¶2 Dodd and the victims, Kari Sloniker and Shane McInturff, were next door neighbors in apartments located near the University of Central Oklahoma (UCO) in Edmond, Oklahoma. At approximately noon on Saturday, November 5, 1994, Dodd came to Shane's apartment and gave him a check for $70.00. Between 5:00 and 6:00 p.m. that same day, Dodd brought Shane a second check for $70.00. Brian Brown testified he saw both checks from Dodd in Shane's wallet at this time. He further testified that the checks were for the purchase of "crank," also known as methamphetamine. Brown left the apartment at approximately 6:30 p.m.

¶3 Later that evening, Brown, Lisa Eubanks, Shane and Kari went to The Pool Room in Oklahoma City to play pool. Before leaving, the group smoked marijuana and snorted and smoked crank in Kari and Shane's apartment. Eubanks testified at trial that the marijuana and crank were kept in a box which Kari and Shane usually hid under the couch in the living room. Eubanks stated that she first saw approximately one gram of crank in the box and estimated the group used approximately one-quarter gram of the substance prior to leaving to play pool. The drug box was placed back under the couch prior to the group's departure.

¶4 They arrived at The Pool Room at approximately 10:30 p.m. and left at approximately 1:30 a.m. Kari and Shane invited Eubanks to watch a movie and spend the night at their apartment. Consequently, Brian Brown dropped off the group at Kari and Shane's apartment and returned to his home. Upon entering the apartment, Shane asked Kari to roll a joint. When Kari pulled the box from under the couch, the drugs were missing. Shane became extremely angry and loud, kicking the common wall between his and Dodd's apartment. Shane was shouting and accusing Dodd of stealing the drugs. Shane eventually went next door to Dodd's apartment and an argument ensued over the missing drugs. Soon after Shane's return to his apartment, Dodd followed and told Shane to keep the noise down because his child was trying to sleep.

¶5 After Dodd left the apartment, Shane and Kari began discussing the possibility of cashing Dodd's checks and telling Dodd's wife that he was using drugs. They believed this would cause problems for Dodd as his wife was unaware he was using drugs again. Due to the "intense" atmosphere at the apartment, Eubanks left at approximately 3:00 a.m. and returned to her dormitory room. This was the last time anyone saw Shane and Kari alive.

¶6 Dodd's trip to Shane's apartment and the harsh words exchanged between the two was also witnessed by Dennis Kersh, who lived in a nearby apartment. At approximately 2:00 a.m., Kersh was awakened by a loud noise outside. Believing someone might have hit his car, Kersh went outside to inves-

---

1. As to Count I, the jury found the existence of the following aggravating circumstances: (1) Dodd was previously convicted of a felony involving the use or threat of violence to the person; (2) Dodd knowingly created a great risk of death to more than one person; and (3) the existence of a probability that Dodd would commit criminal acts of violence that would constitute a continuing threat to society. As to Count II, the jury found the following aggravating circumstances: (1) Dodd was previously convicted of a felony involving the use or threat of violence to the person; (2) Dodd knowingly created a great risk of death to more than one person; (3) Dodd committed the murder for the purpose of avoiding or preventing a lawful arrest or prosecution; and (4) the existence of a probability that Dodd would commit criminal acts of violence that would constitute a continuing threat to society.

tigate. After returning to his bed, Kersh heard someone yell "fuck" from the area of Shane's apartment. Kersh, looking out his window, saw Dodd run from his apartment into Shane's apartment. As Dodd entered the apartment, he yelled "what the fuck is going on."

¶ 7 Later that Sunday, Brian Brown found Shane's pay check in his car. At approximately 5:00 p.m., Brown went by Shane's apartment to return the paycheck. No one answered when Brown knocked on the door. Dodd was sitting outside his apartment and stated that he had not seen Shane or Kari that day. Brown drove by again at 6:30 p.m.; seeing no lights, he did not stop.

¶ 8 On Monday, November 7th, Dodd stated he went by Shane's apartment to give him a ride to work. No one responded to his knocks and Shane did not report to work that day. Robert McInturff, Shane's father, returned home from work at approximately 5:30 p.m. and found four messages from Dodd on his answering machine. The messages were regarding Shane's failure to respond to Dodd's knocks at his apartment door that morning. Concerned, Mr. McInturff went to check on Shane. He arrived at the apartment at approximately 5:50 p.m. Mr. McInturff ran into Dodd as he reached the apartment. Dodd again stated that he had not heard from Shane or Kari that entire day. Unable to open the door to the apartment, Mr. McInturff and Dodd obtained a pass key from the landlord.

¶ 9 Upon entering the apartment, Mr. McInturff observed two bodies on the bedroom floor. Mr. McInturff testified that he did not turn on the bedroom light and that Dodd remained near the front door. McInturff yelled to Dodd to call 911. Both bodies were lying face down, next to each other, and there was a great deal of blood surrounding the victims. Because of the location and position of the bodies, Mr. McInturff stated that he was unable to determine the manner in which Shane and Kari were killed. He further noted that Shane's wallet was lying open in the living room.

¶ 10 Keith Randolph, a City of Edmond fireman, was the first of the emergency personnel to reach the scene. Randolph was unable to tell how the victims died because of the position of the bodies. However, he told EMSA emergency technicians that he believed the victims were killed by gunshots to the head. James Towers, an EMSA technician, was also unable to tell the manner in which the victims were killed. When Edmond Police Officer Lindell McLemore arrived at the scene, he was told that it appeared the victims had been shot. Similarly, when Steve Slater, an investigator with the Medical Examiner's Office, arrived at the scene at approximately 10:30 p.m., he was unable to tell the manner of death until he rolled the bodies over for further examination. At this time, it became apparent the victims' throats had been slashed. Conversely, Rocky Yardley, a technical investigator with the Edmond Police Department, examined the bodies without moving them at approximately 9:25 p.m., and found that Shane's throat had been cut.

¶ 11 The earliest that any of the emergency personnel, police, or technical investigators at the scene were able to tell the manner in which the victims had been killed was 9:25 p.m. In a key piece of evidence, Dodd spoke with his supervisor at Jetta Products at 6:41 p.m. and informed him that Shane and his wife had been murdered and that their throats had been cut. Additionally, on the same day the bodies were discovered, Dodd had returned a hunting knife he had borrowed from a co-worker. The medical examiner testified at trial that the victims' wounds were caused by a weapon with a thick, heavy blade.

¶ 12 Further investigation of the crime scene revealed the trace presence of blood in and around the sink in the victims' bathroom, as if someone had cleaned their hands in the sink. Moreover, a towel appeared to be missing from the bathroom. The missing towel was found in the dumpster located in the apartment complex. A hair found on the towel was consistent with Dodd's hair. DNA testing was also conducted on a blood stain found on the towel.[2] Both victims could not

2. DNA could not be extracted from the hair   found on the towel.

be excluded as possible contributors of the DNA on the towel stain.

¶13 When questioned about the two $70.00 checks Dodd had given Shane, Dodd claimed he had loaned Shane the money to buy a car from Shane's uncle. Dodd stated that Shane had returned the checks to him on Saturday afternoon, sometime between 3:00 p.m. and 5:00 p.m., because the uncle was selling the car to someone else. Dodd said he had torn the checks into four or five pieces and placed them in the trash. No checks or check remnants were found. Furthermore, Robert McInturff testified he had made arrangements with Shane to loan Shane money to buy a car from his brother in Arkansas.

¶14 While incarcerated in the Oklahoma County Jail awaiting trial, Dodd spoke with another inmate, Kenneth Bryant. Bryant testified that while watching the O.J. Simpson trial on television in the jail common area, Dodd appeared interested in the DNA portion of the trial and asked Bryant if he thought police could obtain DNA evidence if blood got on a nugget ring or the velcro portion of a watch band. Bryant testified he asked Dodd if he committed the murders to which Dodd replied, "Yes … but proving it will be a different thing." Dodd allegedly told Bryant that he had gone to the victims' apartment to retrieve the checks he had given Shane and to take whatever drugs were there and that things "went wrong." Dodd explained that he did not want his wife to find out about the checks. He was worried she would find out he was using drugs. Bryant further testified that Dodd stated he figured his co-worker, who had loaned him the hunting knife, would know that he had the murder weapon.

¶15 On appeal, Dodd raises eighteen propositions of error. However, finding error requiring reversal, we need only address Proposition IV(E) which deals specifically with informant Bryant's testimony. After Dodd's preliminary hearing, Bryant recanted his testimony that Dodd had admitted killing the victims. The recantation occurred during an interview with investigators for another capital murder case. Bryant later reasserted the truthfulness of his original testimony. Bryant testified at trial about his recantation and the circumstances surrounding the recantation. Bryant explained that he told the investigator "what she wanted to hear" in hope that she would arrange for him to get an O.R. bond[3] so he could get out of jail and return to his dying wife.

¶16 Proposition IV(E) deals specifically with two letters written by Bryant regarding his recantations. Defendant's Exhibit 20 is a letter dated August 29, 1995, written to Stephanie Brown, an investigator involved with the Carter murder case. In this letter Bryant expresses his belief that regardless of his recantations, he will still receive favorable treatment from the District Attorney's Office in exchange for his testimony in the Dodd and Carter capital murder cases. Defendant's Exhibit 21 is a letter also dated August 29, 1995, written to an assistant in the District Attorney's Office regarding the Carter murder case. Bryant discusses in this letter his long history of testifying in first degree murder trials in Oklahoma County. He states he is no longer "afraid … and no longer [has] to lie … for anyone in this world—especially the OK County D.A.'s Office." He further states, "The testimony from me in this case about a confession that you both asked & wanted from me—you'll not get—because as you very well know—there wasn't one."

¶17 During the trial, the State objected to the admission of these letters and the court sustained the objection finding the letters had not been properly provided in discovery. Dodd contends in Proposition IV(E) that the trial court improperly prevented defense counsel from impeaching informant Bryant with the prior inconsistent statements contained in these letters. We agree.

¶18 Title 22 O.S.Supp.1996, § 2002(B)(3)(a) provides that upon the prosecutor's request, the defendant shall allow him access to inspect any paper or document in the defendant's possession which the defendant *intends* to offer in evidence. Such a request was made by the prosecution in this case. However, even if the trial court prop-

---

**3.** Own Recognizance Bond.

erly found a discovery violation,the trial court's ruling barring use of Defendant's Exhibits 20 and 21 was an excessive sanction under the circumstances of this case. *See Allen v. State*, 1997 OK CR 44, 944 P.2d 934, 937. The excluded evidence was admissible for impeachment purposes pursuant to 12 O.S.1991, § 2613(B). Bryant's credibility was a pivotal issue in this case. The evidence in this case was wholly circumstantial and Bryant was a key witness for the State. To deny Dodd the opportunity to fully attack Bryant's credibility was error. Thus, we must determine whether this error requires reversal.

■ ¶ 19 To determine whether or not this error is harmless, we look to the analysis set forth in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Five factors need to be considered: "(1) the importance of the testimony, (2) its cumulativeness, (3) the presence or absence of corroborative or contradicting evidence, (4) the extent of cross-examination allowed, and (5) the overall strength of the State's case." *Omalza v. State*, 1995 OK CR 80, 911 P.2d 286, 308. *See also Beck v. State*, 1991 OK CR 126, 824 P.2d 385, 390.

¶ 20 In all capital murder cases, the trial judge files with this Court a written trial judge's report. This report has statements relative to the trial. The trial judge was asked the question, "although the evidence suffices to sustain the verdict, does it foreclose all doubt respecting the defendant's guilt?" The judge answered, "no." The judge further noted that in the second stage of the trial, the victim impact statements were very prejudicial and inflammatory, and the judge noted that in her opinion the jury was influenced by passion or prejudice or other arbitrary factors in imposing the sentence. Although this Court is not bound by the judge's statements, they are helpful on a close case such as this one. There are two primary pieces of evidence as to guilt. One was the statement by Appellant as to how the deaths occurred prior to the time that the medical examiner determined such fact. The other evidence consisted of statements by Appellant to the jailhouse informant.

¶ 21 The way the deaths occurred was more of a gangland type execution. There is a question as to how one person could have performed the killings involved in this fact situation without assistance from another person.

■ ¶ 22 The second piece of concrete evidence has to do with statements the Appellant supposedly made to a jailhouse informant. Courts should be exceedingly leery of jailhouse informants, especially if there is a hint that the informant received some sort of a benefit for his or her testimony. This problem is even greater here when we look at the error that is discussed above as to the withdrawal of the statements by the informant and what the informant has to say about promises made to the informant. The Court should look to how many times the informant has testified before for the District Attorney's office. Here we very clearly have two letters that may or may not be true but should have been in evidence. Consequently, under the unique circumstances of this case, we find Dodd's murder conviction must be reversed.

■ ¶ 23 The Constitution of the United States prohibits a jailhouse informant from testifying to a defendant's statements when the informant works for the government and "deliberately elicits" or coerces statements related to a crime for which an accused has been indicted.[4] While the state action affected by such a government/informant relation-

4. *See Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302(1991) (defendant's confession to jailhouse informant was motivated by fear of physical violence and informant's promise of protection found to be coerced—error to admit confession but admission of coerced confession could be harmless error); *Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (government informer permitted to question a prisoner regarding an uncharged crime); *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) (Sixth Amendment does not prohibit the admission of statements not elicited by the informant); *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (defendant's statements inadmissible because they were "deliberately elicited" by a government informer regarding defendant's pending charges.) *See generally White*, Regulating Prison Informers Under the Due Process Clause, 1991 S.Ct.Rev. 103, 104–105.

ship triggers careful constitutional scrutiny, it permits equally insidious reliability problems to escape attention. Consider the more common example of the informant who does not work for the government when procuring incriminating statements. In these cases, there is no state action and therefore no constitutional concern.[5] But, this distinction matters little in terms of informant reliability or trustworthiness.[6] Irrespective of whether initially contacted by the state, most informants relay incriminating statements to the state in expectation of benefit in exchange.[7]

¶ 24 Today we adopt a procedure to ensure complete disclosure so that counsel will be prepared to cross-examine an informant-witness.[8] The following procedures shall apply to all jailhouse informant testimony not specifically excluded by the United States Constitution.

■ ¶ 25 At least ten days before trial, the state is required to disclose in discovery: (1) the complete criminal history of the informant; (2) any deal, promise, inducement, or benefit that the offering party has made or may make *in the future* to the informant (emphasis added); (3) the specific statements made by the defendant and the time, place, and manner of their disclosure; (4) all other cases in which the informant testified or offered statements against an individual but was not called, whether the statements were admitted in the case, and whether the informant received any deal, promise, inducement, or benefit in exchange for or subsequent to that testimony or statement; (5) whether at any time the informant recanted that testimony or statement, and if so, a transcript or copy of such recantation; and (6) any other information relevant to the informant's credibility.

■ ¶ 26 In all cases, where a court admits jailhouse informant testimony, OUJI–CR 2d. 9–43 (amended as follows) shall be given:

The testimony of an informer who provides evidence against a defendant must be examined and weighed by you with greater care than the testimony of an ordinary witness. Whether the informer's testimony has been affected by interest or prejudice against the defendant is for you to determine. In making that determination,you should consider: (1) whether the witness has received anything (including pay, immunity from prosecution, leniency in prosecution, personal advantage, or vindication) in exchange for testimony; (2) any other case in which the informant testified or offered statements against an individual but was not called, and whether the statements were admitted in the case, and whether the informant received any deal, promise, inducement, or benefit in exchange for that testimony or statement; (3) whether the informant has ever changed his or her testimony; (4) the criminal history of the informant; and (5) any other evidence relevant to the informer's credibility.

¶ 27 Upon review, we are unable to find this error harmless beyond a reasonable doubt. Defendant's Exhibit 21 directly called into question the truthfulness of Bryant's testimony. It further demonstrates the pressure under which Bryant may have been to lie for the State. The information contained in Defendant's Exhibit 21 was not cumulative to any other impeachment evidence presented. While defense counsel was able to impeach Bryant with his numerous convictions, his prior history as an informant, and by calling into question Bryant's possible motives for testifying, the State's case was far from overwhelming. Consequently, un-

---

**5.** *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (creating two-part test for a attributing a private party's action to the state).

**6.** 12 O.S.1991, § 2102. All rules of evidence in judicial proceedings are designed to ensure that evidence is reliable and probative.

**7.** "The judicial process is tainted and justice cheapened when factual testimony is purchased, whether with leniency or money." *U.S. v. Sin-*

*gleton,* 144 F.3d 1343, 1347 (10th Cir.1998), *overruled on rehearing en banc* 165 F.3d 1297 (10th Cir.1999).

**8.** In *Freeman v. State,* 1994 OK CR 36, 876 P.2d 283, 290, *cert. denied,* 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994), this Court declined to adopt a similar procedure but did not foreclose the possibility of regulating the admission of a jailhouse informant's testimony.

der the unique circumstances of this case, we find Dodd's murder convictions must be **RE-VERSED.**

¶ 28 The judgment and sentences of the trial court are **REVERSED** and the matter remanded to the district court for **NEW TRIAL.**

LAYDEN, J., concurs.

STRUBHAR, P.J., and CRAIG, J., specially concurring.

LUMPKIN, V.P.J., concurs in part/dissents in part.

JOHNSON, J., joins in STRUBHAR'S specially concurring.

STRUBHAR, P.J.: specially concurring.

¶ 1 I concur in the Court's decision to reverse and remand this case to the district court for a new trial based on the error stemming from the defense's inability to impeach the jailhouse informant in this case. I further agree and applaud the majority's decision to adopt notice requirements and to mandate the administration of the amended version of Instruction No. 9–43 OUJI–CR(2d) when the prosecution uses a jailhouse informant as part of its case.

¶ 2 This case illustrates the problems associated with the use of jailhouse informants who often play a pivotal role in an accused's conviction. While I recognize the need to use jailhouse informants' testimony, we must take certain precautions to ensure a citizen is not convicted on the testimony of an unreliable professional jailhouse informant, or snitch, who routinely trades dubious information for favors. The use of such untrustworthy witnesses carries considerable costs, especially in death-penalty cases, by undermining the foundation of cases where the stakes are the highest. The misuse of such informants also adds financial costs to taxpayers when convictions based on their testimony are reversed to be retried. Therefore, to ensure the utmost reliability in the admis-

sion of jailhouse informant testimony, I would also mandate the reliability hearing prescribed in the original opinion in this matter. *Dodd v. State,* 1999 OK CR 29, *rehearing granted vacating and withdrawing opinion,* 70 OBJ 2952 (Oct. 6, 1999). As with the use of *Daubert* [1] hearings to ensure the relevance and reliability of novel scientific expert testimony, this reliability hearing will allow the trial court to perform its gatekeeping function and filter out prejudicial jailhouse informant testimony that is more probably false than true. I am authorized to state that Judge Johnson joins in this writing.

LUMPKIN, Vice–Presiding Judge: concurs in part/dissents in part.

¶ 1 The facts of this case present two main issues which require adjudication by this Court in determining the merits of this appeal.

¶ 2 Initially, the case presents the question of whether the disclosure of impeachment evidence is encompassed within the provisions of the Oklahoma Criminal Discovery Code, 22 O.S.Supp.1994, § 2001 et seq. An analysis of this issue begins with the recognition both in the Code of Civil Procedure and the Code of Criminal Procedure the common law is abrogated through statutes enacted by the Oklahoma Legislature. See 22 O.S.1991, § 9; 12 O.S.1991, § 2. In applying this principle to the Oklahoma Evidence Code, Professor Whinery recognized:

> It is a well-established principle that 'general and comprehensive legislation, prescribing minutely a course of conduct to be pursued and the parties and things affected, and specifically describing limitations and exceptions, is indicative of a legislative intent that the statute should totally supersede and replace the common law dealing with the subject matter.'

*See* 2 L. Whinery, *Oklahoma Evidence: Commentary on the Law of Evidence,* § 2.12 (citation omitted). This principle of law

---

1. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469 (1993). *See also Kumho Tire Co., Ltd., v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999) (concluding that

Daubert's general holding setting forth the trial judge's general "gatekeeping" obligation applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge.)

means this Court is not writing on a clean slate, but is restricted by interpretation and application of the Discovery Code. Analyzing the issue presented within the context of this Court's scope of review, the Court must decide whether the disclosure of impeachment evidence is encompassed within the context of the Oklahoma Criminal Discovery Code. The plain language of both Section 2002(A)(1)(a) and Section 2002(B)(1) arguably only includes witnesses a party may plan to call in their case in chief. If that is the case, then the trial court discovery order was not violated.

¶ 3 The evidence the trial court denied consisted of two letters written by the witness, Kenneth Bryant. These letters, marked as Defendant's Exhibits 21 and 22, could be viewed as either impeachment evidence or evidence of bias. *See e.g. Beck v. State,* 824 P.2d 385 (Okl.Cr.1991). In *Beck,* this Court recognized certain types of evidence were not included in the provisions of the Oklahoma Evidence Code. *Id.* at 388. In those circumstances, common law principles would apply to its admissibility. Because the provisions of the Oklahoma Criminal Discovery Code are not specific, and lend credence to the interpretation impeachment evidence is not included as a part of the Code, I agree the trial court's denial of the admissibility of Defendant's Exhibit 21 and 22 was error.

¶ 4 The determination that the trial court's denial of these exhibits was error does not answer the ultimate question in this particular case as to its effect on the trial proceedings. Just as this Court is bound to apply the provisions of the Oklahoma Evidence Code and the Oklahoma Criminal Discovery Code, it is also bound to apply the provisions of 20 O.S.1991, § 3001.1, which prohibits the reversal of a case unless "the error complained of has probably resulted in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right." *See also* 12 O.S.1991, § 2104.

¶ 5 A review of Bryant's two letters, together with his testimony which encompassed fifty-nine (59) pages of direct examination and ninety-four (94) pages of cross-examination, reveals almost all of the contents of these two exhibits were presented during the examination of Mr. Bryant. The defense very effectively painted for the jury a picture of Mr. Bryant as a long-term jailhouse informant and, to a great deal, impeached his testimony in this trial. At most, the admission of Defendant's Exhibits 21 and 22 would have constituted cumulative evidence. This Court has long held it is not reversible error for a trial judge to deny admission of cumulative evidence. *See Zackery v. State,* 572 P.2d 580, 586 (Okl.Cr.1977). *See also Spuehler v. State,* 709 P.2d 202, 205 (Okl.Cr.1985); *Stoner v. State,* 568 P.2d 298, 301 (Okl.Cr.1977); 12 O.S.1991, § 2403.

¶ 6 This Court has recognized the special scrutiny with which jurors should view the testimony of jailhouse informants. Indeed, this Court has provided that special jury instructions should be used whenever a jailhouse informant takes the stand as a witness in a criminal proceeding and testifies. *See* OUJI–CR (2nd) 9–43. Regardless of how distasteful one might find the use of an informant, whether it be a jailhouse informant or an accessory to a crime who turns State's evidence, it is widely recognized the use of such witnesses has taken place from the common law forward and "[t]his engrained practice of granting lenience in exchange for testimony has created a vested sovereign prerogative in the government." *See United States v. Singleton,* 165 F.3d 1297, 1301 (10th Cir.1999), *cert. denied,* —— U.S. ——, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999).

¶ 7 It is well within this Court's prerogative to require jury instructions which place this type of testimony in its proper perspective for the trier of fact. See 12 O.S.1991, § 577.1. For that reason, I agree with the Court's amendment of OUJI–CR (2nd) 9–43. However, I find the Court disregards the provisions of the Oklahoma Criminal Discovery Code in *sua sponte* creating the Court-generated rule on witness discovery in regards to a jailhouse informant.

¶ 8 The provisions of 22 O.S.Supp.1994, § 2002(A) set forth the procedures for the disclosure of evidence by the State. Once the Legislature has enacted statutes to cover that procedure, absent a finding of a constitutional requirement, the Court should apply

those statutory procedures. Those procedures, set forth in Section 2002, in no way deny a defendant the opportunity to obtain the very evidence which the Court seeks to mandate in the majority opinion. In fact, in the present case, defense counsel, armed with the ammunition they obtained through discovery, performed in an outstanding manner in attacking and testing Bryant's veracity and motivation for testifying. The statutory process worked, and the trier of fact was fully informed. A review of the evidence reveals that the two letters which were not entered into evidence were merely cumulative of the testimony given by Bryant at trial, and revealed nothing more on the issue of Bryant's bias or prejudice. Because of that fact, I do not find the denial of the admission of this cumulative evidence was an error which "probably resulted in a miscarriage of justice, or constitutes a substantial violation of the constitutional or statutory right." 20 O.S.1991, § 3001.1.

¶ 9 Therefore, I dissent to the Court's disregard of the provisions and procedures of the Oklahoma Criminal Discovery Code by *sua sponte* implementing the automatic disclosure requirement regarding a particular class of witnesses. That procedure is not necessary, is outside the scope of the issues raised in this appeal, is not shown by the evidence in this case to be a needed procedure, and is already well encompassed within the current Discovery Code provisions. Likewise, I dissent to the Court's decision to reverse the judgment and sentence in this matter due to the fact the failure to admit cumulative evidence did not violate the provisions of 20 O.S.1991, § 3001.1.

CRAIG, M.C., Assigned Judge: specially concurring.

¶ 1 I concur in the Court's opinion and write only to comment on my reasons for joining the majority of the Court, as now constituted, in receding from the reliability hearing prescribed in the original opinion in this matter. *Dodd v. State*, 1999 OK CR 29, rehearing granted vacating and withdrawing opinion, 70 OBJ 2952 (Oct. 6, 1999).

¶ 2 The original opinion established a procedure for and mandated that before a jailhouse informant could be called to testify, the court would make a determination, under prescribed criteria, as to the reliability of the proffered witness and whether such witness should be allowed to testify.

¶ 3 Arguments are made that such procedure will allow the trial court to perform gatekeeping functions, as in he use of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469 (1993), in ensuring reluctance and reliability of novel scientific expert testimony; or *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 3148, 111 L.Ed.2d 638 (1990), in determining the trustworthiness of testimony of a minor child; or *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), in allowing the trial court to make a threshold determination of the admissibility of a confession. Compelling reasons prompted each of the provisions for these threshold determinations, which do not extend to the use of a jailhouse informant as a witness, and adequate protection is afforded by the discovery procedure and the use of cautionary jury instructions as mandated in the majority opinion.

¶ 4 Many witnesses, in addition to jailhouse informants, may have a motive to lie. That is not a sufficient reason to remove the trier of fact from making a determination of the credibility of such witness.