2005 OK CR 23

**Victor Wayne HOOKS, Appellant**

**v.**

**STATE of Oklahoma, Appellee.**

**No. PCD–2002–980.**

Court of Criminal Appeals of Oklahoma.

Dec. 7, 2005.

## OPINION DENYING POST–CONVICTION RELIEF

CHAPEL, Presiding Judge.

¶ 1 Victor Wayne Hooks was convicted of First Degree Murder and manslaughter. He was sentenced to death for the murder and to 500 years imprisonment for manslaughter. This Court affirmed the judgments and sen-

tences.[1] This Court denied Hooks's Application for Post–Conviction relief,[2] and the Tenth Circuit denied in part his federal habeas petition.[3] On December 31, 2002, Hooks filed a Second Application for Post–Conviction Relief in a Death Penalty Case, requesting an evidentiary hearing on the issue of mental retardation. We granted that motion on January 15, 2003, and remanded the case to the District Court of Oklahoma County for an evidentiary hearing. We subsequently remanded the case for a jury determination on the issue of mental retardation.[4] That jury hearing was conducted in June, 2004, before the Honorable Jerry D. Bass, and concluded with a jury determination that Hooks is not mentally retarded. The District Court filed its Findings of Fact and Conclusions of Law with this Court on July 23, 2004. Hooks and the State each filed supplemental briefs in response to those findings and conclusions; Hooks raises seven propositions of error in his Supplemental Brief.[5]

■ ¶ 2 The Court remanded this case for a jury determination followed by findings of fact and conclusions of law from the trial court. While the trial court's findings and conclusions assist this Court in its decision, the jury is the finder of fact in this proceeding. Thus, we will review the alleged errors occurring during the proceeding on remand in the same manner as errors raised on direct appeal from a trial on the merits. This Court reviews the jury's factual determination in the light most favorable to the State, to determine whether any rational trier of fact could have found that the defendant failed to meet his burden of proving mental retardation by a preponderance of the evidence.[6] After a complete review of the record, transcripts, exhibits and pleadings filed in this case, we find that no relief is required. The Court commends the trial court and counsel. This hearing was carefully conducted to protect Hooks's rights and tightly focused on the narrow issue of mental retardation.[7] Jurors were told Hooks had been found guilty of a crime, but neither the crime itself nor the sentence imposed was mentioned. Throughout the trial no reference was made to capital punishment, the death penalty, or death row. No facts of the crime in this case were introduced, and evidence of other crimes was confined to that which was relevant to the issue of mental retardation. Neither victim impact evidence, nor evidence which had been used in aggravation of the murders for which Hooks was convicted, was introduced.

■ ¶ 3 In Proposition I Hooks claims the evidence was sufficient to prove he is mentally retarded. Hooks has the burden of proof in these proceedings. In order to prove he is mentally retarded, Hooks must first demonstrate to the court that he had an IQ test under 70. After meeting this threshold requirement, Hooks must show, by a preponderance of the evidence, that he meets the three prongs of the *Murphy* test: subaverage intellectual ability, manifestation before age 18, and significant limitations in

1. *Hooks v. State*, 1993 OK CR 41, 862 P.2d 1273, cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994).

2. *Hooks v. State*, 1995 OK CR 56, 902 P.2d 1120, cert. denied, 517 U.S. 1145, 116 S.Ct. 1440, 134 L.Ed.2d 561 (1996).

3. The Tenth Circuit remanded one issue (regarding the applicability of Oklahoma's procedural bar) for a hearing in the United States District Court for the Western District of Oklahoma. *Hooks v. Ward*, 184 F.3d 1206 (10th Cir.1999).

4. *Hooks v. State*, PCD–2002–980, *Order Remanding for Jury Determination of Mental Retardation* (Okl.Cr. December 9, 2003) (not for publication).

5. As both briefs were due simultaneously, the State did not have the opportunity to respond specifically to Hooks's propositions. Rather, the State offers argument and authorities supporting the trial court's findings and conclusions.

6. *Myers v. State*, 2005 OK CR 22, ¶ 6, 7, 130 P.3d 262.

7. The proceedings followed our instructions in *Lambert v. State*, 2003 OK CR 11, 71 P.3d 30, 31: "The jury should not hear evidence of the crimes for which Lambert was convicted, unless particular facts of the case are relevant to the issue of mental retardation. Any such evidence should be narrowly confined to that issue. The jury should not hear evidence in aggravation or mitigation of the murders for which Lambert was convicted, or any victim impact evidence."

adaptive functioning in at least two of nine skill areas.[8] Hooks has not met this burden.

¶ 4 In addition to being a threshold requirement, evidence of IQ testing may be admitted to the jury to prove whether a defendant functions at a significantly sub-average intellectual level. Hooks presented evidence of IQ test results from first grade through the months immediately preceding the mental retardation proceeding. Those test scores ranged from 80 to 53. The first test, given when Hooks was in the first grade, had a full scale IQ of 80.[9] Hooks was next tested in fifth grade and received a score of 70. The psychometrist's notes state that Hooks's attention and effort varied during the test, and he was generally indifferent during its administration. She did recommend him for educable mentally handicapped (special education) classes.

¶ 5 In 1978, when he was sixteen, Hooks was injured when a tractor-trailer struck his car, and his father died in an unrelated accident six months later. Hooks's mother applied for Social Security disability on his behalf as a result of the accident, and also sued the trucking company, claiming Hooks's mental ability had been damaged in the accident. In 1978, after the accident, Dr. Tuoti tested Hooks with an IQ of 61, but suggested that Hooks did not cooperate during testing and his intellectual level might have been higher. In 1979, Dr. Phillips tested Hooks in connection with the lawsuit and obtained an IQ of 57; he noted that Hooks was moderately cooperative but gave up quickly on difficult tasks. Dr. John Call examined Hooks in 1980, in connection with the Social Security Claim. He determined that Hooks was mentally retarded and had catatonic schizophrenia, but did not produce an IQ score because he was unable to independently test Hooks.[10] During the mental retardation proceedings, both Hooks's and the State's expert witnesses agreed that these examinations might

not reflect Hooks's true intellectual ability, either because he did not cooperate with testing or due to the trauma of the accident and the loss of his father. Testimony also showed that in 1988, Dr. Phillip Murphy tested Hooks with an IQ of 80.

¶ 6 Hooks has had three IQ tests since his trial and direct appeal in this capital case. In 1994, Hooks was evaluated by Dr. Gelbort who gave Hooks a neuropsychological evaluation which included an IQ score of 72. Dr. Gelbort was not specifically asked to examine Hooks for mental retardation and did not administer any adaptive functioning tests. While Dr. Gelbort did not, at that time, diagnose Hooks as mentally retarded, during testimony at the mental retardation proceeding he stated that, taking into account his testing and subsequent tests, he would now make that diagnosis. In 2002 Dr. Cowardin gave Hooks adaptive functioning tests and an IQ test with a score of 76, and diagnosed him with mild mental retardation. Hooks cooperated with both Dr. Gelbort and Dr. Cowardin during the testing process. In 2004 Dr. Hall evaluated Hooks and obtained an IQ of 53. She noted Hooks was not cooperative. The experts agreed this score probably did not reflect Hooks's intellectual ability.

¶ 7 The experts agreed this range of scores put Hooks in a "gray area". The tests of 70 and below all reflected some degree of lack of cooperation on Hooks's part, from variable attention span to refusal to respond. Two of them were obtained after Hooks suffered the trauma of an accident and his father's death, which could have caused him to test lower than his actual intellectual level. The expert witnesses agreed that the most reliable scores were those obtained by Dr. Gelbort and Dr. Cowardin, with results of 72 and 76. Neither of these scores meets the "seventy or below" requirement in *Murphy*,[11] although Dr. Gelbort's results are within that range

8. *Murphy v. State*, 2002 OK CR 32, 54 P.3d 556, 567–68.

9. Information on this test was very limited and the expert witnesses all agreed it should not be accorded too much weight.

10. Dr. Call relied in part on Dr. Tuoti's testing, in diagnosing mental retardation. He testified

that Hooks was mute during the exam and he may have been experiencing a psychotic episode. Dr. Call did find that Hooks had adaptive functioning deficits in at least two areas. He estimated Hooks's social functioning at a 2.7 years age level.

11. *Murphy*, 54 P.3d at 568.

using the standard error of measurement (a five-point range on either side). Given the other testimony, it was not unreasonable for jurors to determine that the most reliable IQ evidence offered did not fall within the first prong of the *Murphy* definition, functioning at a significantly sub-average intellectual level. A rational trier of fact could have found that Hooks failed to meet this burden by a preponderance of the evidence.

¶ 8 Hooks met the second *Murphy* requirement. Whether he was considered mentally retarded or "slow", everyone agreed this condition had manifested itself before he turned eighteen. In fact, Hooks had been diagnosed with mild mental retardation during a stay at Eastern State Hospital, and was placed in educable mentally handicapped classes by fifth grade. However, standing alone, this is not enough to conclude that Hooks is mentally retarded for capital sentencing purposes.

¶ 9 In large part Hooks relied on the same evidence to prove both the *Murphy* requirements of significantly subaverage intellectual level and significant deficits in adaptive functioning.[12] Insofar as Hooks relied on his IQ tests to show subaverage intellectual functioning, the discussion above shows those results were inconclusive. Dr. Cowardin found Hooks had significant limitations in adaptive functioning in communication, functional academics, self-direction, and health and safety. The State presented evidence specifically countering these findings. Taken as a whole, the evidence showed Hooks had some difficulties communicating but could understand others, make himself understood, express his wishes, and understand those of other people. The category of functional academics includes both school progress and the ability to use acquired knowledge in life situations. While Hooks had very poor grades and was in some special education classes, he reads at least at a fourth grade level and reads for pleasure in prison, can shop for clothing, food, and leisure goods, has pawned items for cash, bought cars, and leased apartments, drives, and can follow road signs and instructions while driving. Dr. Cowardin found Hooks has some deficiency in self-direction because, according to her information, he has a history of unproductive use of his time. Other evidence showed that, before being incarcerated, he had worked as a laborer, accepted the responsibility to provide food and diapers for his children, and employed some women as prostitutes, requiring them to give him their earnings and a portion of their food stamps. Dr. Cowardin found deficits in health and safety because Hooks gave only one answer to each test question when two were called for. However, the answers Hooks gave were appropriate. In addition, as the trial court noted, "Hooks was meticulous in his personal grooming and housekeeping and required the women that lived in his home to conform to his standards."[13] Although circumstantial evidence suggested Hooks may have had help writing letters from prison, he did write detailed and cogent letters to his daughter which included fatherly advice, descriptions of prison, and expressions of his feelings for her. Taken as a whole, a rational trier of fact could have determined that this evidence did not show significant deficits in adaptive functioning or a significantly subaverage intellectual level. Hooks failed to meet his burden on this issue.

¶ 10 Hooks's slow intelligence manifested itself before age eighteen. His IQ tests certainly suggest he has borderline intelligence but do not clearly meet the *Murphy* definition for mental retardation. In any case, all the definitional requirements must be met, and evidence countered Hooks's claims of significant adaptive functioning deficits. Taken in the light most favorable to the prevailing party, a rational trier of fact could have found that Hooks provided insufficient evidence to show he was mentally retarded. Proposition I is denied.

---

12. The evidence presented goes to several subaverage intellectual level categories, including (a) ability to understand and process information, (b) communication, (c) learning from experience or mistakes, and (d) ability to engage in logical reasoning.

13. Findings of Fact and Conclusions of Law at 4, ¶ 3.

■ ¶ 11 In Proposition II Hooks claims the trial court erred in instructing the jury, over his objection, that mental retardation must be "present and known" before age eighteen. This is the standard uniform jury instruction adopted in *Murphy*.[14] Hooks argues that the phrase "present and known" is more restrictive than the *Murphy* definition of mental retardation or those of other states. Hooks claims that, while the *Murphy* language requires only that someone observed his mental disability as a child, the instruction requires him to prove that his subaverage intellectual condition was recognized as mental retardation and diagnosed. We need not reach the merits of this claim, as Hooks can show no prejudice from the instruction as worded.[15] Hooks presented ample evidence that his disability was both recognized and diagnosed as mild mental retardation before he was eighteen. Proposition II is denied.

■ ¶ 12 In Proposition III Hooks claims the trial court erred in refusing his request to submit non-unanimous verdict forms to the jury. When setting forth the procedure for capital mental retardation jury determination proceedings in *Lambert v. State*, we stated, "If there is no unanimous verdict either finding or rejecting mental retardation, the trial court will resentence Lambert to life imprisonment without parole." [16] Hooks argues this procedure requires that the jury receive non-unanimous verdict forms. On the contrary, juries are always encouraged to reach a unanimous verdict, if possible, and the use of unanimous verdict forms in these proceedings reflects that. This Court recognized in *Lambert* that a jury might not be able to determine unanimously whether a petitioner is mentally retarded. The language above provides that, in that situation, it is the responsibility of the trial court to make a finding that a petitioner is mentally retarded and sentence him to life without the possibility of parole. We recently rejected this same claim.[17] The trial court did not err in providing a unanimous verdict form, and this proposition is denied.

■ ¶ 13 Hooks claims in Proposition IV that the trial court erred in limiting his cross-examination of State's witness Dinh. Admission of evidence is within the trial court's discretion, and will be disturbed only on a showing of prejudice.[18] The extent of cross-examination is within the discretion of the trial court.[19] Cross-examination may be limited to the subject matter of the direct examination and encompass questions of witness accuracy, memory, veracity, or credibility.[20] Ms. Dinh had lived with Hooks and worked for him as a prostitute when she was a teenager, beginning at age thirteen. She testified about her observations of Hooks during the time she knew him, including his ability to lease apartments, buy cars, and oversee the actions of several women and girls. When defense counsel attempted to cross-examine Dinh by asking where her parents were when she met Hooks, the State objected and the trial court ruled that her parents' location had no bearing on Dinh's credibility. Hooks has not shown otherwise,

---

14. *Murphy*, 54 P.3d at 570, Appendix A. Recognizing that the language in the *Murphy* opinion differs slightly from the language in the adopted instruction, the trial court gave an additional instruction: "Whether mental retardation before the age of eighteen was present and known is a question of fact to be decided by you the jury. To establish that the first signs of mental retardation appeared and were recognized before the defendant turned eighteen, lay opinion and poor school records may be considered." Hooks did not object to this instruction.

15. We note that we rejected this issue on its merits in *Myers*, 2005 OK CR 22, ¶ 14, 130 P.3d 262.

16. *Lambert*, 71 P.3d at 32. We noted that the jury's finding does not constitute a special verdict, as it does not determine a petitioner's guilt or innocence. *Lambert*, 71 P.3d at 31, n. 14. This has no bearing on whether jurors should receive unanimous verdict forms.

17. *Myers*, 2005 OK CR 22, ¶ 16, 130 P.3d 262.

18. *Douglas v. State*, 1997 OK CR 79, 951 P.2d 651, 665, *cert. denied*, 525 U.S. 884, 119 S.Ct. 195, 142 L.Ed.2d 159 (1998).

19. *Parker v. State*, 1996 OK CR 19, 917 P.2d 980, 984, *cert. denied*, 519 U.S. 1096, 117 S.Ct. 777, 136 L.Ed.2d 721 (1997); 12 O.S.2001, § 2611(C).

20. *Charm v. State*, 1996 OK CR 40, 924 P.2d 754, 769, *cert. denied*, 520 U.S. 1200, 117 S.Ct. 1560, 137 L.Ed.2d 707 (1997).

and this ruling was not an abuse of discretion.

¶ 14 Dinh testified that she lived with Hooks for most of her teenage years, spending a few months in foster care when she had a baby. Hooks wanted to cross-examine on this issue to show that Dinh had previously stated she lived with Hooks for only a few months, and that she was in foster care for several years. The trial court allowed counsel to ask Dinh how long she had been in foster care but refused to allow counsel to impeach Dinh with unsworn hearsay statements. The trial court noted that, however long Dinh had actually lived with Hooks, her testimony had been limited to her observations of his mental abilities and there was no dispute that she did have the opportunity to observe Hooks for some time. This decision was not error. Hooks also wanted to impeach Dinh with statements contradicting her prior testimony regarding other women Hooks knew at the time. While counsel was allowed to question Dinh about her previous statements, the trial court refused to allow counsel to impeach Dinh with prior testimony which involved people and issues other than Hooks and factors bearing on mental retardation. The court found that any discrepancies in the prior testimony might bear on Dinh's credibility, but the entire line of questioning was wholly irrelevant to the issue of mental retardation. This decision was not an abuse of discretion. Dinh's evidence that Hooks ran a prostitution ring was limited to the ways in which this demonstrated his mental abilities, and the trial court limited cross-examination to that issue as well. While Dinh may not have accurately testified about the length of time she spent with Hooks, Hooks offers no evidence to suggest that her testimony regarding her observations during the time she did spend with him were inaccurate.[21] Proposition IV is denied.

¶ 15 Hooks claims in Proposition V that the trial court erred in refusing to admit evidence that Dr. Philip Murphy had been professionally disciplined. Dr. Gelbort testified that records showed Dr. Murphy had tested Hooks in 1988, with an IQ score of 80. Apparently to cast doubt on the validity of that score, counsel wanted to question Dr. Gelbort regarding his knowledge that Dr. Murphy had subsequently been professionally disciplined. Counsel attempted to do this using a document from the Oklahoma Board of Psychologists which counsel had given Dr. Gelbort the night before, but which had not been provided to opposing counsel. The trial court sustained the prosecutor's objection, holding that the failure to provide the document was a discovery violation. We agree with the trial court's ruling that this was not impeachment evidence. The trial court found that, as counsel had talked with Dr. Gelbort about Dr. Murphy and his reputation in the medical community, and using the document to discredit Dr. Murphy, counsel should have provided the document in discovery.[22] This decision was not an abuse of discretion. Hooks completely fails to show that prohibition of the evidence was an unduly harsh sanction for a discovery violation.[23] As our discussion above shows, Hooks's IQ tests covered a wide range. The information regarding many of the tests, including Dr. Murphy's, was sparse. Neither the State nor defense experts relied on Dr. Murphy's test in forming their opinion regarding Hooks's mental abilities. In fact, only Dr. Gelbort mentioned Dr. Murphy's test. The record does not indicate that information discrediting Dr. Murphy could have affected the jury's determination. This proposition is denied.

¶ 16 In Proposition VI Hooks claims the trial court erred in allowing the State to

21. Dr. Hall had relied on Dinh's statements in the presentence report for some of her findings. In those statements Dinh claimed she had lived with her husband during the time period of this crime. Subsequent investigation indicates that Dinh's husband had filed for divorce, claiming abandonment, and that Dinh filed a protective order against her husband during that time. Counsel did not attempt to question Dinh about these discrepancies during the mental retardation proceedings, but suggests on appeal that this information should have been used to impeach Dinh's credibility. We find that this information resembles the lines of questioning discussed above.

22. 22 O.S.2001, § 2002(B).

23. *Dodd v. State*, 2000 OK CR 2, 993 P.2d 778, 782–83.

introduce, over objection, (a) evidence that Hooks had run a prostitution ring, (b) portions of Hooks's interview with police before he was arrested for the murders in this case, and (c) letters Hooks wrote to his daughter from prison. All this evidence was relevant to the issue of mental retardation and the trial court did not abuse its discretion in allowing it to be admitted.

¶ 17 As we indicated in *Lambert*, we are wary of attempts to introduce evidence of crimes for which a petitioner has been convicted.[24] Reciting the facts of particular crimes will seldom be relevant to the issue of mental retardation, but may well confuse and inflame the jury. For the same reason, *Lambert* did not contemplate the introduction of factual evidence of unadjudicated crimes. However, we recognized that evidence of particular kinds of criminal activity may be relevant to the issue of mental retardation.[25] This is such a case. The State introduced evidence that Hooks employed several women as prostitutes. In the course of that employment, he rented apartments, purchased food and other supplies, oversaw the women's activities, required that they give him their earnings, took responsibility for that money, and enforced rules regarding behavior, housecleaning, and personal hygiene. All this directly bears on Hooks's mental abilities. While experts agree that mentally retarded people can commit crimes, categories of crime differ. On one hand, individual acts of violent crime, such as armed robbery or rape, require little or no abstract thought or complex planning. By contrast, running a prostitution ring over a period of several years resembles engagement in a continuing criminal enterprise. This requires a level of abstract thought, coupled with the ability to carry out plans, which might be beyond the capabilities of a mentally retarded person. The trial court scrupulously limited this evidence, focusing on those aspects which have some bearing on

Hooks's mental abilities. Under these circumstances, the evidence was relevant to the issue of mental retardation and not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or any other factor bearing on admissibility.[26] The trial court did not abuse its discretion in admitting this evidence.

¶ 18 The trial court was equally vigilant regarding the transcript of Hooks's statements to Officer Mullenix before his arrest. The admitted portions of this interview do not contain any facts of the crime itself. In fact, there is no reference to the crime; these statements cover Hooks's thoughts and actions over a period of time before the crime was committed. Hooks describes the errands he had just run, including fixing a muffler, getting a security deposit back from a former landlady, and going to the store. He talks about his conversation with his wife about money, asking for her help in paying bills and retrieving things from the pawnshop. Hooks explains he pawned things to get diapers, groceries, and "material things" like a television. He describes his efforts to work, his relations with his wife and in-laws and his own family, and his feelings as he expressed them to his wife. All this goes to Hooks's ability to understand and process information, to communicate, to function in society, and to care for himself and others. These are factors in the *Murphy* definition of mental retardation.[27] The trial court did not err in admitting this evidence.

¶ 19 Witnesses testified that several letters were in Hooks's handwriting. Their content, including signatures and context, confirmed that Hooks wrote them to his daughter from prison. They were admitted over objection. Hooks claims these letters are not relevant to the issue of mental retardation because there was no evidence he wrote them without help, and no indication of how long he took to write them.[28] Those

24. *Lambert*, 71 P.3d at 31.

25. *Id.* (unless particular facts of the case are relevant to the issue of mental retardation).

26. 12 O.S.Supp.2003, §§ 2401, 2403.

27. *Murphy*, 54 P.3d at 567–68.

28. Subsequent investigation revealed an inmate who states he has helped Hooks write letters. Evidence also suggests that the money-making scheme Hooks refers to in one letter may not have happened. Had this information been available at trial, it would have gone to credibility of the evidence rather than admissibility.

factors may go to the jury's determination of the letters' usefulness as evidence, but not to admissibility. The letters bear on Hooks's ability to write and communicate. Their contents include advice showing that Hooks has learned from past experience, has some understanding of other people's reactions, and that he can engage in logical reasoning. Their existence tends to make a fact of consequence more or less probable, and their probative value is not· substantially outweighed by prejudice or any other factor bearing on admissibility.[29] The trial court did not abuse its discretion in admitting these letters.

¶ 20 In Proposition VII Hooks complains that the trial court erred in removing a potential juror for cause. The *Murphy* definition of mental retardation for capital punishment purposes is substantially similar to the accepted clinical definitions of mental retardation. However, it differs slightly in requiring proof of significant limitations in adaptive functioning in nine, rather than ten, areas (omitting the category of "leisure"). Juror Paddock had professional experience with mental retardation. She was asked whether, if the state and clinical definitions differed, she could follow the laws and apply the definition given by the trial court. She replied that she could not if the differences were significant, and was excused for cause over Hooks's objection. The decision to excuse a juror for cause is within the trial court's discretion.[30] A juror must agree to follow the law; any other response would prevent or substantially impair performance of her duties in accordance with her instructions and oath.[31] While in fact the differences between the state and clinical definition are so small there is little likelihood of conflict, that is not the issue. In order to be qualified as a juror, Juror Paddock had to agree to follow the law, whatever it was. She could not do this. The trial court did not abuse its discretion in excusing her for cause. Proposition VII is denied.

¶ 21 The jury determined that Hooks failed to meet his burden to prove mental retardation by a preponderance of the evidence. Upon reviewing the evidence, we conclude that a rational trier of fact could have reached this determination. The trial court concluded that the jury's factual determination was not imposed under the influence of passion, prejudice or any other arbitrary factor. We agree.

**DECISION**

Hooks's application for post-conviction relief is **DENIED** and his sentence of death is **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App.2005, the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

LUMPKIN, V.P.J., concur in results.

C. JOHNSON, A. JOHNSON and LEWIS, JJ., concur.

· LUMPKIN, V.P.J., concurs in results.

¶ 1 I concur in the results reached by the Court, but write separately to address certain points. Initially, I find this Court has properly applied the standard of review set forth in *Myers v. State,* 2005 OK CR 22, 130 P.3d 262, for use on appeal when a defendant challenges the sufficiency of the evidence following a jury finding that he or she is not mentally retarded.

¶ 2 Additionally, I find the broad range of IQ test results spanning from 53 to 80 made a *ipso facto* showing Petitioner is not mentally retarded. A truly mentally retarded individual will not, indeed cannot, produce test results over such a broad spectrum. That is, a person with an IQ in the low fifties is incapable of suddenly scoring in the low eighties. While Petitioner apparently had some learning difficulties as he progressed through school, which may have been compounded by the automobile accident when he was 16 years old, mental retardation does not appear to be the cause of those problems.

**29.** 12 O.S.Supp.2003, §§ 2401, 2403.

**30.** *Hanson v. State,* 2003 OK CR 12, 72 P.3d 40, 48.

**31.** *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).

Mental retardation is a cognitive defect that originates at birth and is not subject to change over time. *See Murphy v. State,* 2003 OK CR 6, ¶ 23, 66 P.3d 456, 460. As an inherent defect that manifests in childhood, the disease may not be cured or rehabilitated. This is one of the primary reasons why the Supreme Court determined in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) that mentally retarded persons must be protected from the imposition of the death penalty.

¶ 3 I also agree that Petitioner's ability to carry on a criminal enterprise, *i.e.* a prostitution ring, was relevant evidence to the issue of mental retardation as it was indicative of his adaptive functioning and level of intelligence. There is little difference in relevance between this type evidence and a person's past work experience. Both demonstrate one's ability to plan, manage, execute plans, follow through with orders, etc. Just because a person has chosen a past work history of criminal conduct does not mean the evidence is inadmissible. If it is relevant to show a person's intellectual ability and adaptive functioning pursuant to the *Murphy* criteria, it should be admissible.

¶ 4 But the Court wrongly attempts to limit the type of other crimes evidence that may be presented, stating "individual acts of violent crime, such as armed robbery or rape, require little or no abstract thought or complex planning" and therefore are not relevant to the issue of mental retardation. Whether or not prior crimes required abstract thought or complex planning depends on the facts of that particular crime, not the type of crime committed. Evidence of a defendant's prior criminal history (including adjudicated and unadjudicated offenses) should not be categorically excluded. Certainly, the evidence must be scrutinized to ensure it is not presented merely to create prejudice or inflame the jury. However, as in this case, it is possible and appropriate to present that evidence in such a manner as to be a valid tool in assisting the fact finder in evaluating the true abilities or limitations of the defendant.

¶ 5 The same is true regarding the facts of the homicide for which the defendant re-

ceived the death penalty. If the manner in which the crime was planned, managed, and carried out is such that those facts address a defendant's level of intelligence or adaptive functioning, the evidence should be admitted, to the extent it survives a 12 O.S.2001, § 2403 analysis, to assist the fact finder in reaching its decision under the law and the evidence of the case. This Court cannot be a prophet as to what may be relevant in a particular future case, and thus, should not attempt to act like one with such broad, non-fact based arbitrary pronouncements. As in this case, we must evaluate the evidence in all future cases based on the context and relevance to the issues presented.