2005 OK CR 27

**Darrin Lynn PICKENS, Appellant**

**v.**

**STATE of Oklahoma, Appellee.**

**No. PCD–2002–983.**

Court of Criminal Appeals of Oklahoma.

Dec. 7, 2005.

Vicki Ruth Werneke, Chief, Capital Post–Conviction, O.I.D.S., Norman, OK, attorney for petitioner at trial and appeal.

Wyndi Thomas Hobbs, Appellate Defense Counsel, O.I.D.S., Norman, OK, attorney for petitioner at trial.

Michael Loeffler, Don I. Nelson, Asst. District Attorneys, Sapulpa, Oklahoma, attorneys for the State at trial.

## OPINION GRANTING POST–CONVICTION RELIEF

## AFTER REMAND FOR JURY DETERMINATION

## ON ISSUE OF MENTAL RETARDATION

C. JOHNSON, J.

¶1 Petitioner, Darrin Lynn Pickens, was convicted by a jury in Creek County District Court, Case No. CF 1990–66, of First Degree Murder, while in the commission of Robbery with a Dangerous Weapon, in violation of 21 O.S.Supp.1989, § 701.7 (Count 1) and Feloniously Carrying a Firearm, in violation of 21 O.S.Supp.1989, § 1283 (Count 2).[1] The jury set punishment at death on the murder conviction and ten (10) years imprisonment on Count 2.[2] We affirmed Petitioner's conviction and death sentence for First Degree Murder, but we reversed Petitioner's conviction for Robbery with a Dangerous Weapon and remanded for a new trial.[3] *Pickens v. State,*

---

1. Petitioner's original convictions for First Degree Murder, Feloniously Carrying a Firearm, and Robbery with Firearms were reversed and remanded for new trial in *Pickens v. State,* 1994 OK CR 74, 885 P.2d 678, *overruled in part on other grounds, Parker v. State,* 1996 OK CR 19, ¶ 23, 917 P.2d 980, 986, *n.* 4.

2. The jury found the following aggravating circumstances: (1) that Pickens had previously been convicted of a felony involving the use or threat of violence against the person; (2) that the murder was committed for the purpose of avoiding or preventing lawful arrest or prosecution;

and (3) that there existed the probability that Pickens would commit criminal acts of violence that would constitute a continuing threat to society.

3. Petitioner was also convicted of murder and other crimes in Tulsa County District Court, Case No. CF 90–717, and his convictions and sentences were affirmed by this Court. *Pickens v. State,* 1993 OK CR 15, 850 P.2d 328, *cert. denied,* 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994), *denial of post-conviction relief affirmed in* 1996 OK CR 6, 910 P.2d 1063. On federal habeas review, Petitioner was granted relief from

2001 OK CR 3, 19 P.3d 866. Petitioner's first Application for Post–Conviction Relief was denied. *Pickens v. State*, PCD 2000–285 (Okl.Cr. August 30, 2001)(not for publication). The United States Supreme Court denied his Petition for Writ of Certiorari on June 28, 2002. *Pickens v. Oklahoma*, 536 U.S. 961, 122 S.Ct. 2668, 153 L.Ed.2d 842 (2002).

¶ 2 On October 14, 2002, Petitioner filed a Second Application for Post–Conviction Relief, pursuant to 22 O.S.2001, § 1089, and a Motion for Evidentiary Hearing, pursuant to Rule 9.7(D), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2002). On July 23, 2003, this Court granted post-conviction relief on Proposition One and remanded the case to the District Court of Creek County for a jury determination on the issue of mental retardation. *Pickens v. State*, 2003 OK CR 16, 74 P.3d 601. The jury trial on mental retardation was held before the Honorable Donald D. Thompson, District Judge, on February 17th—20th, 2004. The jury returned a verdict that Mr. Pickens is not mentally retarded, and the trial court filed Findings of Fact and Conclusions of Law on April 13, 2004.[4] Mr. Pickens filed a Supplemental Brief and raised four (4) propositions of error.[5] The State of Oklahoma did not file a brief.[6]

■ ¶ 3 On appeal, Petitioner challenges the jury's verdict as contrary to the weight of the evidence. A defendant must prove mental retardation by a preponderance of the evidence. *Myers v. State*, 2005 OK CR 22, ¶ 6, 130 P.3d 262, 2005 WL 3334712; *State ex. rel. Lane v. Bass*, 2004 OK CR 14, ¶ 8, 87

P.3d 629, 631–632; *Lambert v. State*, 2003 OK CR 11, ¶ 4, 71 P.3d 30, 32. Pickens was required to show, by a preponderance of the evidence, that he met the three (3) pronged definition set forth in *Murphy v. State*, 2002 OK CR 32, ¶ 31, 54 P.3d 556, 567–568: subaverage intellectual ability which limits his ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses and to understand the reactions of others; manifestation before age eighteen (18); and significant limitations in adaptive functioning in at least two of nine skill areas. *See Myers, id.; State ex.rel. Lane v. Bass, id.; Lambert, id.* The jury was required to weigh the evidence presented by the parties and determine whether Petitioner met his burden of proof that he is mentally retarded. *Myers, id.*

> Whether a person is mentally retarded is a question of fact. In evaluating questions of fact decided by a jury we give great deference to the jury's finding. We will not disturb the jury verdict where there is any competent evidence reasonably tending to support it. *See Johnson v. State*, 2004 OK CR 23, ¶ 10, 93 P.3d 41, 44–45.

(omitted) *Myers, id.*

■ ¶ 4 On appeal, when a petitioner challenges a jury's determination that he/she is not mentally retarded, we review the evidence in the light most favorable to the State to determine if any rational trier of fact could have reached the same conclusion. *Id.* After complete review of the records, transcripts, exhibits and pleadings in this case, we find

---

his death sentence and the case was remanded to the district court with instructions to grant the writ, conditioned upon the state court's conducting a new sentencing trial or commuting petitioner's sentence to life imprisonment or life imprisonment without parole. *Pickens v. Gibson*, 206 F.3d 988, 1003 (10th Cir.2000). Pickens subsequently waived jury trial on resentencing in exchange for a sentence of life imprisonment without parole. *See* Tulsa County District Court Docket, Case No. CF 90–717 (September 4, 2001).

4. While the trial court's findings of facts and conclusions of law assist this Court in its decision, the jury is the finder of fact in this proceeding. *Myers v. State*, 2005 OK CR 22, ¶ 7, 130 P.3d 262, 2005 WL 3334712.

5. Mr. Pickens claims he presented sufficient evidence to prove he is mentally retarded. He also claims his constitutional right to a competent tribunal was compromised because the judge presiding over the trial was mentally impaired; the trial court erred in instructing the jury that mental retardation must be "present and known" before age 18; and the trial court erred by denying Mr. Pickens' request to submit non-unanimous verdict forms to the jury.

6. Pursuant to *Salazar v. State*, 2004 OK CR 4, ¶¶ 7–9, 84 P.3d 764, both parties had twenty (20) days from the date the trial court filed its Findings of Fact and Conclusions of Law or from the filing of the transcripts, whichever is later, in which to file a supplemental brief.

the jury's verdict is contrary to the evidence, even in the light most favorable to the State, and we find Petitioner met his burden of proving, by a preponderance of the evidence, that he is mentally retarded.

¶ 5 The record shows Pickens met all three prongs of the *Murphy* definition of mental retardation. He presented testimony from school teachers, a school administrator, a public school psychologist, and a school superintendent that he scored in the borderline to low range on intelligence tests to qualify him for placement in the Sand Springs Public School classes for the "educable mentally handicapped" (EMH). He attended those classes from third to twelfth grade and, while he did graduate from high school, he graduated from EMH classes. His grades, acceptable for an EMH student, were given not based upon his comparison to mainstream students but rather were based upon his own performance in relation to his Individual Education Program (IEP).

¶ 6 His teachers all testified he was of sub-average intellectual level and functioned at about a third to fifth grade level in verbal skills and a sixth to eighth grade level in math skills. His school EMH placement and performance showed his deficits in academics. His teachers all agreed he had significant communication deficits and his verbal skills were low. Although he was able to talk, carry on conversation and print, he did so at the level of a ten year old or fourth grader. Department of Corrections (DOC) personnel also confirmed Pickens's communications deficits, noting things had to be explained to him in simple terms and simple words. Upon entry into Oklahoma's prison system, Pickens was tested and failed the literacy test. One DOC witness testified that if he were in school, he would be placed in the fourth grade.

¶ 7 His teachers, and family members through interviews with Pickens's expert witness, reported Pickens had deficits in self-care. His elementary EMH teacher reported his physical appearance was "ragged and wrinkled"; his personal hygiene was very poor; his hair was not combed. His personal hygiene was described as not normal for a fourth grader.

¶ 8 Family members reported Pickens wore his shoes on the wrong feet up to the age of nine; his siblings tried to teach him to identify his big toe and small toe and to line the shoes up in front of them, but he could not figure it out. At the age of nine or ten, he still routinely buttoned his shirt askew, wore it inside out and did not recognize either of those things until someone pointed it out. He was eleven or twelve before he learned to tie his shoes. He did not brush his hair and left it matted. He had to be reminded to brush his teeth long after a normal child would have assumed that function independently. He had to be told to bathe even when he had noticeable body odor. Other children reportedly made fun of him because of his appearance and grooming. Dr. Cunningham testified this information suggested Pickens had "significant deficits in self-care well after you would expect those capabilities to be established." He testified this deficit overlapped into the area of "self-direction in terms of brushing teeth, bathing, that kind of thing."

¶ 9 Pickens also presented evidence of deficits in the area of social judgment and planning ability. In elementary school, he was a loner and did not get along well with other children. At fourteen, when tested by the public school psychologist, his test results revealed deficits in social skills and social judgments. The results showed his inability to size up social situations and to know what appropriate thing should happen which reflected a problem with social skills and ability to plan. At fourteen, Pickens was unable to identify the areas of the body where his heart and lungs were located, which reflected a lack of knowledge in the areas of basic physiology. In the area of safety, Pickens reportedly threw gasoline on a smoldering fire despite being told not to and suffered serious burns as a result.

¶ 10 Pickens presented evidence attending to each prong of *Murphy*. His evidence demonstrated sub-average intellectual functioning, before the age of eighteen; and adaptive functioning deficits in at least two skill areas. He was required to prove each prong of *Murphy* by a preponderance of the evidence and the record reflects that he did.

¶ 11 The State's case focused primarily on Pickens's IQ scores. Pickens was administered four intelligence tests between 1973 and 1990 with scores ranging from 70 to 79. He was first tested at seven years old and scored a 71; he was tested again in seventh grade and scored a 79; he was tested at fourteen and scored a 70. His last test was given after he was incarcerated in DOC, and he scored 76. Although the State's expert, Dr. Call, opined the better indicator of Pickens's actual IQ was an "average" of all his test scores, he admitted there was no reason to discount the reliability of the tests given to him prior to the age of eighteen and also admitted the score of 70 from the 1980 test was good enough to meet the IQ test requirement set forth in Murphy.[7] These test scores, from 70 to 79, while not determinative, tend to illustrate Pickens functions at a significantly sub-average intellectual level.

¶ 12 For the purpose of determining whether one is eligible to raise the issue of mental retardation, a contemporary IQ test includes a test or tests, ostensibly given before the commission of the capital crime, which "may be understood by contemporary standards." Murphy, 2002 OK CR 32, ¶ 31, n. 21, 54 P.3d at 567. Both experts, for Pickens and for the State, testified the tests administered to Pickens prior to 1990 were appropriate tests at the time they were administered.

■ ¶ 13 For a defendant to claim he or she is ineligible for the death penalty by reason of mental retardation, the defendant must first show a score of 70 or below on a contemporary IQ test. Murphy, id. That more than one test was administered and/or that more than one score is above 70 does not matter; only one test score of 70 or below needs to be shown for a defendant to "get his foot in the door" and claim ineligibility for the death penalty by reason of mental retardation.

¶ 14 Scores above 70 are relevant to the first prong of Murphy. The scores might suggest a defendant's intellectual functioning is or is not sub-average depending on the other evidence of low intellectual functioning. The State and the trial court should be reminded that IQ scores are one of many factors to be considered but "are not alone determinative" of whether a defendant/petitioner is mentally retarded. Murphy, id.

¶ 15 In this case, while Pickens was initially identified at the age of seven with below average intellectual functioning based on his IQ test score of 71, his subsequent school performance, continued low performance on subsequent IQ tests (including another IQ score of 70), and his performance on tests given even after his incarceration in the Department of Corrections substantiate his low level of intellectual functioning.

¶ 16 Pickens attended Educable Mentally Handicapped (EMH) classes at Sand Springs Public Schools from third grade through twelfth grade. Judy Copeland, Special Education Coordinator for the Oklahoma Department of Education, testified that children who were mildly mentally retarded were placed in EMH classes and that the school system, in the 1970s and 1980s, did not refer to those children as mentally retarded. To qualify for EMH classes, the student had to have an IQ test score between 55 and 75. The EMH students were taught in self-contained classrooms; they could graduate from high school and their diplomas would not look different from other students' diplomas. They were reevaluated every three years to determine whether placement in EMH was appropriate.

¶ 17 Dr. Lee Rand Smith, assistant Superintendent of the Sand Springs Public Schools from 1977–1988 and Director of Special Education, confirmed Copeland's testimony, noting the term mentally retarded was "passé" because of the stigma attached to it; those (mildly mentally retarded) children were referred to as EMH or handicapped. Dr.

---

7. This testimony obviously referenced the requirement that a defendant must first show a score of 70 or below on a contemporary IQ test to claim he or she is ineligible for the death penalty by reason of mental retardation. Murphy, id. This is not a finding to be made by the jury; rather it is a preliminary determination made by this Court or by the trial court in deciding whether a defendant can challenge his sentence based on ineligibility due to mental retardation.

Smith said the goal of EMH classes was to educate the student to the maximum efficiency of his ability. He admitted some EMH students graduated from high school, but their level of functioning was not the same. Some even took driver's education. Dr. Smith said EMH graduates' diplomas would look like other students' diplomas but the transcripts would indicate EMH. He did not think EMH students were included in class rank. Dr. Smith noted EMH students "looked normal" unless there was a genetic problem and some could pass in the community as a normal person; however, in terms of class work, EMH students could not achieve in a regular classroom setting and had special needs for learning.

¶ 18 Willard Jones, Pickens's special education teacher in EMH classes from 1974 to 1977, graded Pickens according to his Individualized Education Program (IEP) and did not compare him to other students when grading. He said Pickens made mostly A's and B's in Jones's EMH classes. He said if Pickens's diploma reflected a class rank it would be unfair because Pickens's grades were for EMH classes. Jones said Pickens had difficulty understanding concepts. While he could add, subtract, multiply and divide, his reasoning was not good. His reading level was also very low. He said there was "absolutely, positively, emphatically no doubt" in his mind that Darrin Pickens was mentally retarded.

¶ 19 Paul Schuster taught Pickens in EMH classes at Charles Page High School from 10th to 12th grade. He said Pickens had difficulty with abstract thinking and logical reasoning; he was quiet and withdrawn. Schuster tried to get him to verbalize more and recommended he be mainstreamed as much as possible in functional math and physical education. In 10th grade, Pickens made a "C" in functional math first semester, but then did not pass the second semester. He was returned to EMH math in 11th grade because he did not succeed in the mainstream class. Schuster said Pickens did not write in cursive; he only printed and it took him a long time. He knew Pickens graduated in May of 1983 from EMH classes and said his reading level was 4th grade when he

graduated. He had very poor writing and communication skills.

¶ 20 When Pickens was sixteen (16), he was re-evaluated by Dr. Patricia Logan, a school psychologist, for his continued placement in the EMH program. His full scale score on the Wechsler Intelligence Scale for Children—Revised (WISC–R) was seventy (70). His developmental age on the Bender Visual Motor Gestalt Test was "within average limits." On the Peabody Individual Achievement Test, his reading recognition and comprehension tested on the second grade level, his spelling and math on the fourth grade level, information on the second grade level, and his overall score fell in the third grade level. He performed "below second grade" level on the Wold Sentence Copying Test and fell within the "second to third grade" level on the Durrell Analysis of Reading Difficulty. Dr. Logan concluded in her written report that Pickens was "presently functioning in the Borderline range of intelligence" and recommended his continued placement in the EMH program. In her deposition prior to the jury trial, Dr. Logan stated Pickens met the definition for mild mental retardation and met the requirements at that time for placement in EMH classes which required an IQ of seventy (70) or below.

¶ 21 DOC personnel also confirmed Pickens's very low reading/math levels upon his entry into the Department of Corrections. Lisa Reading, Mr. Pickens's corrections case manager at Jackie Brannon Correction Center (JBCC), saw him daily and completed his classification assignment. She placed him in the Adult Basic Education (ABE) class based upon his below sixth grade ability in reading and math. Reading said things had to be explained to Pickens more than once, in "simpler" terms, and multi-syllabic words confused him.

¶ 22 Leatha Brannon taught Pickens at the JBCC in 1988. His initial test scores in January of 1988 placed him at the first grade level for vocabulary, second grade level for language mechanics and language expression, total reading comprehension at fourth grade level, and total math level at sixth grade level. She wrote an IEP for Pickens

and stated his goals were to achieve literacy from fourth to eighth grade levels in three months; her math goal was for him to achieve from sixth to eighth grade level in three months. After six months, his reading level had increased to fifth grade level and his math level had increased to eighth grade. Brannon said Pickens's math skills were stronger than his reading skills, but he functioned in the lower level of her students. She did not think he was faking, and she said he made some progress in her classes.

¶ 23 This evidence showed by a preponderance of the evidence that Pickens had subaverage intellectual ability which substantially limited his ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others.

¶ 24 In a light most favorable to the State, we find the jury's verdict was not supported by competent evidence and no rational trier of fact could have reached the same conclusion. Here, Pickens's evidence showed, by a preponderance of the evidence, that he is mentally retarded and the condition manifested and was identified before the age of eighteen.

¶ 25 The State's evidence did not refute Pickens's low level of intellectual functioning. The State's expert witness, Dr. Call, did not question the legitimacy of Pickens's achievement or lack thereof in school; rather, his testimony focused on the lack of written documentation showing a "determination" that Pickens was mentally retarded. We find that opinion specious considering the testimony, in the record, that Pickens was identified by the public school system as "EMH"— the term used to identify mentally retarded students—as early as third grade.

¶ 26 Although Pickens took functional math for two semesters, physical education, and "work-study" classes, he failed one semester of functional math and even performed poorly in work-study which, according to his high school EMH teacher, was "hard to do." Further, while his official high school transcript reflected a GPA of 2.70 and a class rank of 125 of 328, all of the witnesses who dealt with Pickens while he attended

school confirmed his graduation was from the EMH program and his grades were determined by his performance comparison to his own IEP and not by comparison to other students in mainstream classes. The witnesses agreed that ranking him with mainstream students, when he graduated from EMH classes, was not an accurate ranking.

¶ 27 The State presented evidence suggesting Pickens's ability to fill out request for medical service forms and write letters to the trial court after his incarceration showed his ability to function at a higher level. Review of the medical service requests shows Pickens printed and used·simple words and terms to access medical services. Considering that all witnesses agreed his level of communication was somewhere between third and sixth grade, his ability to print simple terms and to articulate simple health related service requests is not surprising. As for the letters Pickens wrote to the court clerk, his use of longer words and ability to express concern over his attorney and trial dates suggest he understood the trial process and the importance of the proceedings. The State's evidence did not show that Pickens did not copy the letters or actually wrote the letters without assistance with grammar and spelling. While these letters and requests have some value and show Pickens could exercise the normal fluency expected of an early adolescent child, could print, could express concern over his health in the simplest of terms, could express concern about his pending legal matters, and could utilize services available in a structured prison environment, this evidence did not disprove or diminish the other significant evidence of his sub-average intellectual functioning.

¶ 28 Dr. Mark Cunningham testified a mildly mentally retarded individual can plan, lie, look after himself, dress, identify pain, be romantic, get married, live independently and even have a job. Dr. Cunningham noted he obtained a basic family history from Pickens and said that was not unexpected or unusual. He also said Pickens's description of a woman he loved who died was not inconsistent with mild mental retardation. He admitted it was not unusual for a mildly mentally retarded person to become emotion-

al at loss of love; however, he said Pickens's description of the woman and her disability was "quite inadequate for somebody that he was in love with." Dr. Cunningham said Pickens seemed to have a very limited understanding of what was wrong with his girlfriend and why she died. The State's expert, Dr. Call, also admitted a mildly mentally retarded person could get married, have children, have a job, have friends, use and enjoy television, show emotion, listen, feed and dress themselves, commit crimes, know and remember the names of family members and people they've had contact with, use complete sentences and obtain academic skills up to about the sixth grade level.

¶ 29 At trial, Dr. Cunningham testified Pickens admitted to him that he first used PCP at the age of fourteen and probably used it ten (10) times. He also smoked pot at the age of nine (9) or ten (10) and used it regularly from the age of thirteen (13) to fifteen (15). The State also presented evidence that, at least on two occasions, Pickens was written up for being under the influence of alcohol or drugs while in prison. Dr. Logan, the psychologist who tested Pickens while in high school, said that substance abuse could affect an individual's score on verbal and performance tests.

¶ 30 While we do not discount Dr. Logan's testimony that substance abuse could certainly affect a person's test performance, the record does not indicate Pickens was under the influence of drugs or alcohol or that anyone even suspected he was under the influence of drugs or alcohol at any time when he was administered the various intelligence tests. In fact, when Dr. Logan tested Pickens, she observed that he was friendly, cheerful, cooperative, and worked hard during testing. While his illicit drug use was relevant in that it might have affected his personality and ability, there was no evidence that it in fact did so.

¶ 31 Even considering the State's evidence that Pickens could print legibly and understandably, that he used drugs in the past, and that he could recount various past events and remember people, Pickens showed, by a preponderance of the evidence, that he functions at a sub-average intellectual level and

that he did so, and others recognized it, before he turned eighteen.

¶ 32 Pickens also showed, by a preponderance of the evidence, significant limitations in adaptive functioning in at least two of the nine skill areas set out in *Murphy*. *Murphy*, 2002 OK CR 32, ¶ 31, 54 P.3d at 567–568. Pickens provided proof of significant limitations in adaptive functioning in five skill areas: academics, communication, self-care, social judgment and planning ability. While the State offered some evidence to refute his adaptive functioning deficits in the area of communication and self-care, the evidence was neither substantial nor compelling. Some of the State's evidence is worth noting as it further reflects the jury's verdict is not supported by competent evidence.

¶ 33 Two witnesses for the State testified Pickens seemed able to communicate normally with them. Former Creek County Sheriff Larry Fugate said Pickens read his Miranda rights waiver, signed it, and did not ask any questions about it. He testified Pickens lied during his interrogation, made up an alibi, and eventually provided information that "fit" the evidence. Larry Fugate believed Pickens did not have any difficulty communicating with him, but admitted Pickens asked him what some multi-syllable words meant. Former Creek County Deputy Frank Smith said he "transported" Pickens a couple of times and they had "real intelligent conversation." Smith said he and Pickens talked about a number of things and he thought Pickens was intelligent.

¶ 34 As to the self-care deficits, Mr. Smith said Pickens looked all right when Smith transported him to or from several court proceedings. He was "always dressed very neatly" in his prison outfit. The State also presented several written requests for health services filled out by Pickens while imprisoned to demonstrate his ability to tend to himself or request medical services. As noted previously, these forms reflect a basic ability to understand health needs at a very simple level. This level of ability is not inconsistent with Pickens's evidence that he functioned at a third to sixth grade level.

¶ 35 The observations made by school personnel, family members, DOC personnel, and expert witnesses relating to adaptive functioning deficits were not refuted. Although the State argued alternative explanations for Pickens's poor grammar (such as most Oklahomans use poor grammar), poor personal hygiene (poor childhood environment), and poor school performance (poor childhood environment), argument is not evidence and the State's evidence relating to the adaptive function deficits was just as much if not more incidental than Pickens's evidence was. Further, Pickens presented evidence of his poor childhood environment which showed his mother gambled, ran numbers, sold PCP, carried a knife and gun, and was unaffectionate towards him as a child. This evidence, in a light most favorable to the State, does not refute Pickens's evidence of adaptive function deficits; rather, it tends to help explain them.

¶ 36 Pickens proved all of the facts in the *Murphy* definition by a preponderance of the evidence. Initially, he showed a reliable IQ test under 70. He showed sub-average intellectual functioning and limitations in adaptive functioning in at least two skill areas. These factors were present and known before Pickens turned eighteen. While the jury returned a unanimous verdict that Pickens was not mentally retarded, we find its verdict was not supported by competent evidence and no rational jury could have reached the same conclusion. *Myers,* 2005 OK CR 22, ¶ 7, 2005 WL 3334712. Further, the jury did not receive the correct jury instruction and the poorly drafted jury instructions likely contributed to its erroneous verdict.

■ ¶ 37 The definition of mental retardation given in this case, Instruction Number 4, did not correctly track the language of the uniform jury instruction, as modified in *Lambert v. State,* 2003 OK CR 11, ¶ 4, n. 13, 71 P.3d 30, 32, *n.* 13. Instruction Number 4 concluded with the following language:

> If you find that the answer to any of these questions is no, then you must find that the Defendant is not mentally retarded and so indicate on your verdict form.

The instruction adopted at OUJI–CR 2d. 4–68A concludes with the following language:

> If you find by a preponderance of the evidence that the answer to each of these questions is yes, then you must find that the Defendant is mentally retarded and so indicate on your verdict form. You must then decide whether the Defendant shall be sentenced to life imprisonment or life imprisonment without the possibility of parole and so indicate on your verdict form.
>
> If you find that the answer to any of these questions is no, then you must find that the Defendant is not mentally retarded and so indicate on your verdict form. You must then consider the remainder of the instructions relating to the death penalty and decide whether the defendant shall be sentenced to life imprisonment, life imprisonment without the possibility of parole or death.

In *Lambert,* 2003 OK CR 11, ¶ 4, n. 13, 71 P.3d at 32, we modified OUJI–CR 2d. 4–68A for use in post-conviction mental retardation jury trials and said:

> . . . where jurors are not asked to sentence Lambert but solely to determine the issue of mental retardation, the trial court should start the instruction with Paragraph 2, beginning "You are advised that a person is 'mentally retarded' . . . ." *In the fourth paragraph, beginning "If you find . . .", only the first and third sentences should be given, omitting the sentences concerning punishment. The fifth paragraph, defining preponderance of the evidence, should be read in its entirety.*

(emphasis added).

¶ 38 Accordingly, the instruction, OUJI–CR 2d. 4–68A, as modified by *Lambert,* should have been given in this case, and the correct instruction would have read as follows:

> If you find by a preponderance of the evidence that the answer to each of these questions is yes, then you must find that the Defendant is mentally retarded and so indicate on your verdict form.
>
> If you find that the answer to any of these questions is no, then you must find that the Defendant is not mentally retarded and so indicate on your verdict form.

¶ 39 Preponderance of the evidence means more probable than not. Instruction Number 4 focused *only* on finding "that the Defendant is not mentally retarded" and mentioned nothing about the possibility of finding the defendant mentally retarded. The language improperly and unfairly encouraged a jury verdict of not mentally retarded. Further, the definitional instruction also did not define the burden of proof in the terms adopted by this Court. Instruction Number 3, entitled "Burden of Proof," was given to the jury. This instruction is unnecessarily complicated and does not use the "preponderance of the evidence" language adopted by this Court in *Murphy* and *Lambert*. In pertinent part, the instruction states:

When I say that a party has a burden of proof on any proposition by the greater weight of the evidence, or use the expression "if you find", or "if you decide," I mean you must be persuaded, considering all the evidence in the case, that the proposition on which such party has the burden of proof is more probably true than not true. The greater weight of the evidence does not mean the greater number of witnesses testifying to a fact, but means what seems to you more convincing and more probably true.

In deciding whether a party has met the burden of proof, you are to take into account all the evidence, whether offered by that party or any other party.

Instruction Number 3.

¶ 40 Throughout the trial the parties and the trial court discussed the burden of proof by a preponderance of the evidence. While the jury might have understood Instruction Number 3 to mean the same thing, it was error for the trial court not to give the uniform jury instruction, as modified in *Lambert*. We recognize Instruction Number 3 was modified from a Uniform Civil Jury Instruction. While this instruction, or a modified version of it, may be appropriate in civil trials, it is not the instruction approved for use in criminal, capital mental retardation trials. We recognize Pickens's counsel did not object to these portions of the jury instructions. Still, we find plain error oc-

curred when the trial court did not give the uniform jury instruction correctly defining mental retardation and correctly instructing the jury, as modified in *Lambert*. The jury, operating under the guidance of these incorrect instructions, returned a specious verdict.

¶ 41 The record of proceedings in this case supports Petitioner's claim that he proved, by a preponderance of the evidence, he is mentally retarded. We cannot be sure the jury instruction did not inappropriately tip the balance in favor of a finding of not mentally retarded. However, even under appropriate instruction, we believe no rational trier of fact could have found Pickens is not mentally retarded and remanding for a new jury trial on mental retardation would be a waste of time and resources.

¶ 42 Accordingly, because we find Pickens proved, by a preponderance of the evidence, that he is mentally retarded, we hereby order his death sentence vacated and modify his sentence to life imprisonment without the possibility of parole.

### DECISION

¶ 43 The jury's verdict on mental retardation in Creek County District Court, Case No. CF 1990–66, is **REVERSED**. The sentence of death is hereby **VACATED** and **MODIFIED** to life imprisonment without the possibility of parole. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeal,* Title 22, Ch.18, App. (2005), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

CHAPEL, P.J. and A. JOHNSON, J.: concur.

LEWIS, J.: concurs in part/dissents in part.

LUMPKIN, V.P.J.: dissents.

LUMPKIN, Vice–Presiding Judge, Dissenting.

¶ 1 I vigorously dissent to the Court's troubling decision, which vacates Appellant's death sentence and modifies that sentence to life imprisonment without parole. The Court's Opinion represents both a miscar-

riage of justice and an abuse of judicial power.

¶ 2 In *Myers v. State,* 2005 OK CR 22, 130 P.3d 262, 2005 WL 3334712 this Court set forth the standard of review to be used on appeal when a defendant challenges the sufficiency of the evidence following a jury finding that he or she is not mentally retarded. That is, "[w]hen the defendant challenges the sufficiency of the evidence following a jury finding that he is not mentally retarded, this Court will review the evidence in the light most favorable to the State to determine if any rational trier of fact could have reached the same conclusion." *Myers,* 2005 OK CR 22, ¶ 7, 130 P.3d at 262, 2005 WL 3334712.

¶ 3 But now, mere weeks after *Myers* was handed down, the Court has misapplied (or sidestepped) that standard, not once, not twice, but three times! *See Lambert v. State,* 2003 OK CR 11, 71 P.3d 30 and *Salazar v. State,* 2005 OK CR 24, 126 P.3d 625. Read together with these other decisions, today's opinion makes it clear that *Myers* has already been disregarded, thus impliedly overruled, and that the Court will substitute itself in as the trier of fact when mental retardation is raised as a defense to capital punishment. That is, the Court will use *de novo* review in appeals from jury decisions on mental retardation rather than the objective rule of appellate review established in *Myers,* for no other conclusion can be reached upon reviewing the procedural history and record in this case.

¶ 4 Petitioner has presented his mental retardation claim to many jurors and courts, but until today none of them have found this claim worthy of relief from the death sentence.

¶ 5 The first instance was when Petitioner was tried for first-degree murder and sentenced to death in a nearly identical case, Tulsa County Case No. CF–90–717.[1] There, Petitioner had raised his mental deficiencies as mitigation for the jury to consider (his expert testified he was borderline mentally retarded with an IQ of 77,[2] well above the 70 threshold that allows one to be considered mentally retarded). Nevertheless, a jury of twelve deliberated the matters presented in aggravation and mitigation and returned a death sentence.

¶ 6 On appeal, this Court[3] affirmed that conviction and sentence. *See Pickens v. State,* 1993 OK CR 15, 850 P.2d 328. In so doing, the Court rejected Petitioner's claim that the instructions had not allowed his jury to properly consider his "educably mentally handicapped" claim. Instead, the Court found the jury had been allowed to give full consideration of all mitigating evidence presented. On habeas review, however, the Tenth Circuit reversed on other grounds, finding a videotaped confession had been improperly admitted,[4] an error that was not harmless beyond a reasonable doubt. *Pickens v. Gibson,* 206 F.3d 988, 997 (10th Cir. 2000). Petitioner subsequently entered into a deal for the sentence of life imprisonment without the possibility of parole.

¶ 7 In his first Creek County trial—concerning the crimes for which he is now on death row—Petitioner also raised the issue of mental retardation. His expert testified concerning Petitioner's level of intelligence and his chronic PCP use that had resulted in brain damage and "changed his attachment to reality." The jury instructions listed Petitioner's "mental age" as a mitigating circumstance, but after deliberating the jury still returned a death sentence. This Court later reversed that sentence on other grounds and remanded the case for a new trial. *Pickens v. State,* 1994 OK CR 74, 885 P.2d 678.

¶ 8 On retrial, Petitioner again raised the issue of mental retardation as part of his defense, and he received another instruction listing mental retardation as a mitigating circumstance. But jurors once again found the aggravating evidence outweighed the

---

1. That case also involved a convenience store robbery and brutal murder, crimes that took place only four days after the crimes in the instant case.

2. *See Pickens v. Gibson,* 206 F.3d 988, 997 (10th Cir.2000).

3. That decision included two members who today find Petitioner is mentally retarded.

4. In that videotaped confession, Petitioner confessed to the crimes in this case.

mitigating evidence and sentenced Petitioner to death. On appeal, this Court affirmed. *Pickens v. State,* 2001 OK CR 3, 19 P.3d 866, *cert. denied,* 536 U.S. 961, 122 S.Ct. 2668, 153 L.Ed.2d 842 (2002).

¶ 9 Thereafter, following *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) and *Murphy v. State,* 2002 OK CR 32, 54 P.3d 556, we granted Petitioner post-conviction relief on his mental retardation claim, remanding his case to Creek County for a jury trial on that specific issue. Petitioner was thus able to present his claim to jurors who were focused on the question at hand, i.e., whether Petitioner's mental retardation claim had substance and rendered him constitutionally ineligible for the death penalty. But once again, Petitioner could not convince a single juror that his level of intelligence provided a basis for relief from the death sentence imposed.

¶ 10 Petitioner has thus presented his mental retardation claim to four separate juries comprised of forty-eight Oklahomans, and it speaks volumes that none of them have granted him any form of relief. Additionally, the District Court, this Court, and the United States Supreme Court have declined to grant relief on several occasions.

¶ 11 That's why it is so disturbing to read the Court's opinion today, when it disingenuously states: "[w]e review the evidence in a light most favorable to the prevailing party to determine if any rational trier of fact could have reached the same conclusion".[5] For the Court does nothing of the sort. Indeed, the Opinion spends some fourteen pages reviewing the record *de novo* or, more often than not, in a light most favorable to Pickens![6]

¶ 12 Thus, rather than reviewing the evidence in a light most favorable to the prevailing party (the State), as is proper, the Court's opinion takes that State-favoring evidence and attempt to explain it all away. Under a *de novo* standard, some of the Court's discussions in this regard might be legitimate, but under the *Myers* standard those discussions represent nothing more than rationalizations for personal opinions.[7]

¶ 13 The opinion thus acknowledges many points that should have weighed—and in the jury's mind clearly did weigh—in the State's favor: Petitioner scored in the borderline to low intelligence range on tests administered in school; he graduated from high school; he functioned as high as an eighth grade level in math; he could "talk, carry on conversation and print"; he had IQ scores ranging from 70 (which barely even qualifies him to be considered mentally retarded) to as high as 79; his latest test showed an IQ of 76; he made mostly A's and B's in school, including both educably mentally handicapped classes and regular classes; his developmental age on the Bender Visual Motor Gestalt Test was within average limits; Dr. Logan found he presently functioned in the borderline range of intelligence; he showed signs of marked improvement in literacy and math when taught by Ms. Brannon; there was no written documentation that Appellant was determined to be mentally retarded in school; his class rank was listed on his high school transcript as 125 out of 328; he could fill out medical services forms and write letters; some of his letters used advanced words and language; the trial judge found Petitioner had the ability to articulate numerous arcane and complicated ideas, memories, and feelings; Petitioner began using PCP and smok-

5. According to Webster's dictionary, a "rational trier of fact" would mean a juror who has the ability to reason. I see nothing in the record to indicate the jurors in question here were even more mentally retarded than Appellant claims to be.

6. This isn't rocket science. The standard of review is identical to that used by this court for years when reviewing the sufficiency of the evidence, the standard adopted by the U.S. Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). And it doesn't become confused by the fact that the defendant rather than the State had the original burden of proof on the issue in question. Indeed, the fact that the burden of proof is switched from the State to a criminal defendant actually renders Appellant's claims even less compelling.

7. I do not doubt my colleagues are sincere when they take the position that Pickens is mentally retarded. The evidence on this point was unquestionably conflicting, and reasonable persons could disagree on that point. The question, however, is whether the jury's verdict is supportable under the law and facts. Here it clearly is.

ing marijuana at an early age; he continued abusing drugs while in prison; substance abuse can affect IQ tests; some witnesses testified that Petitioner could communicate normally; Petitioner was able to plan out detailed lies; one witness spoke with Petitioner and found him to be intelligent; he dressed neatly; Petitioner refused to take standardized adaptive functioning tests; and Petitioner's testing was influence by a poor home environment with drugs and violence.

¶ 14 Today's opinion concedes these evidentiary points, before explaining them away. But there was additional evidence. Petitioner had a 2.7 GPA in school. Prison officials commended him for hard work and dedication in completing assigned tasks. He was able to communicate his medical needs and symptoms to doctors. He wrote letters with legal terms like habeas corpus, notarization, motions, continuances, pro se, ineffectiveness, unprofessional conduct, and record. He had average visual motor integration and neat handwriting. A former sheriff and community-sentencing employee (with a mentally retarded sister) interviewed Petitioner and formed the opinion that he was not mentally retarded. Petitioner was employed and drove an automobile. He could adjust his lies when given additional facts. He had good memory and could carry on a good conversation. One expert testified, based upon Petitioner's 1976 I.Q. test, that there is a 95% chance that Petitioner's I.Q falls between 73 and 85, which is in the borderline intelligence range.

¶ 15 Of course, there was also a lot of evidence introduced by Petitioner to show he is mentally retarded, some of which could be countered with the type of justifications presented in today's opinion. But the point is this: Petitioner's case is a close call under the facts and evidence, and there is evidence supporting either point of view. That is why we have juries, to listen to the evidence, review the facts, and reach what is often a very difficult decision.

¶ 16 Twelve rational jurors reviewed the evidence in this case and did in fact reach the conclusion that Petitioner is not mentally retarded. Unless we can say no rational juror could have possibly reached that decision upon viewing the evidence in a light most favorable to the State, we have a legal duty to affirm. And here, there was ample evidence to support the jury's verdict. Indeed, Petitioner's I.Q. scores, only one of which put him in the mild mentally retarded range, were alone sufficient to support the jury's verdict.

¶ 17 In essence, today's ruling takes the position that the opinion of three judges reviewing a cold record on the issue of mental retardation is "rational," while simultaneously finding the unanimous opinion of twelve qualified jurors who viewed the evidence first hand was irrational. We need not look far to understand that something is terribly wrong with that idea, for Article 2, Section 19 of Oklahoma's Constitution states that "[t]he right of trial by jury shall be and remain inviolate...." And according to our well-established case law, the jury is the exclusive judge of the weight and credibility of the evidence. *See Smith v. State*, 1996 OK CR 50, ¶ 23, 932 P.2d 521, 530; *Robedeaux v. State*, 1993 OK CR 57, ¶ 43, 866 P.2d 417, 429.

¶ 18 I agree that the instructional errors that occurred in this case necessitate relief. But that relief is to reverse this case and remand it for a new trial, not decide the fact question as a matter of law.

¶ 19 The crucial point is this: the evidence of mental retardation was sharply conflicting. As such, the jury's decision must stand. This Court has no business substituting what "we would do" for what twelve competent jurors did. As we said in *Martinez v. State*, 1999 OK CR 33, ¶ 36, 984 P.2d 813, 824:

> ... a fundamental premise of our criminal trial system is that "the jury is the lie detector." Determining the weight and credibility of witness testimony, therefore, has long been held to be the "part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men."

984 P.2d at 824 (internal citations omitted).

¶ 20 What is occurring in this case is reminiscent of Alexander Hamilton's admonition in *The Federalist*, No. 78, when he wrote, "It

can be of no weight to say, that the Courts on the pretense of a repugnancy, may substitute their own pleasure to the Constitutional intentions of the legislature", or in this case the duly valid verdict of a jury of Oklahoma citizens.

¶ 21 According to *Myers*, "We will not disturb the jury verdict where there is any competent evidence reasonably tending to support it." 2005 OK CR 22, ¶ 7, 130 P.3d 262, 2005 WL 3334712. If only that were true.

LEWIS, Judge, Concurs in part/Dissents in part.

¶ 1 I concur in reversing the verdict in this case. However, I dissent to modifying the sentence. I would reverse and remand for a new trial on the issue of mental retardation.