2006 OK CR 28

**Michael Wayne HOWELL, Petitioner,**

v.

**STATE of Oklahoma, Respondent.**

**No. PCD–2003–268.**

Court of Criminal Appeals of Oklahoma.

June 29, 2006.

Bryan Dupler, Laura M. Arledge, Norman, OK, Attorneys for Petitioner at Trial.

Pattye High, David Brockman, Asst. District Attorneys, W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer Dickson, Assistant Attorney General, Oklahoma City, Ok, Attorneys for the State on Appeal.

## OPINION DENYING SECOND APPLICATION FOR POST CONVICTION RELIEF AFTER REMAND FOR JURY DETERMINATION ON ISSUE OF MENTAL RETARDATION

C. JOHNSON, Judge.

¶ 1 Petitioner, Michael Wayne Howell, was convicted by a jury in Oklahoma County District Court, Case No. CRF 1987–6784, of First Degree Murder, committed with malice

aforethought, in violation of 21 O.S.1981, § 701.7. The jury set punishment at death after finding the existence of three (3) aggravating circumstances.[1] On appeal, we affirmed Howell's conviction but vacated his sentence of death and remanded the case for resentencing. *Howell v. State*, 1994 OK CR 62, ¶ 39, 882 P.2d 1086, 1095. A second jury sentencing was held and the jury again returned with a sentence of death after finding the existence of the same three (3) aggravating circumstances found in the original sentencing. On appeal from the resentencing, we affirmed Howell's sentence of death. *Howell v. State*, 1998 OK CR 53, 967 P.2d 1221. We denied his original application for post-conviction relief in *Howell v. State*, PC 1998-200 (Okl.Cr. December 16, 1998)(not for publication). Howell sought further review of the outcome of his state direct appeals. The Supreme Court of the United States denied certiorari in *Howell v. Oklahoma*, 514 U.S. 1113, 115 S.Ct. 1968, 131 L.Ed.2d 858 (1995) and in *Howell v. Oklahoma*, 528 U.S. 834, 120 S.Ct. 93, 145 L.Ed.2d 79 (1999).

¶ 2 On June 16, 2003, Howell, through counsel, filed his Second Application for Post–Conviction Relief, pursuant to 22 O.S. 2001, § 1089. Accompanying his Application was a Motion for Evidentiary Hearing on Post–Conviction Claim, filed pursuant to Rule 9.7(D), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2003). In his sole proposition of error, Howell claimed that in light of *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), his death sentence should be vacated and modified to a non-capital sentence.[2] Alternatively, Howell requested this Court remand the matter for an evidentiary hearing to determine whether his mental disabilities bar his execution. We remanded to the District Court of Oklahoma County for an evidentiary hearing. See Order Granting Motion for Evidentiary Hearing on Proposition

One of Second Application for Post–Conviction Relief, *Howell v. State*, PCD 2003–268 (Okl.Cr. November 18, 2003)(not for publication). After the District Court found a "triable question of fact concerning Petitioner's mental retardation which must be resolved by a jury," we granted post-conviction relief and remanded his case for a jury trial on his claim of mental retardation. *Howell v. State*, PCD 2003–268 (Okl.Cr. May 3, 2004)(not for publication).

¶ 3 Howell's jury trial on mental retardation was held in Oklahoma County District Court, before the Honorable Virgil C. Black, District Judge on May 23rd—27th, 2005. Howell waived his personal appearance at the jury trial, but was represented by counsel prior to and throughout the trial. The jury returned with a verdict that Howell is not mentally retarded. The trial court denied Howell's motion for a new trial. The trial court filed written findings of fact and conclusions of law. Both parties filed Supplemental Briefs on September 23, 2005. Howell asks this Court to reverse the jury's verdict and order a new trial, or in the alternative, modify his sentence of death to a non-capital sentence due to his mental retardation.

■ ¶ 4 Though this appeal remains part of Howell's post-conviction case, we will review errors alleged to have occurred in this jury trial on mental retardation in the same manner as errors raised on direct appeal from a trial on the merits. *Myers v. State*, 2005 OK CR 22, ¶ 5, 130 P.3d 262. Howell raises eleven (11) propositions of error.

1. The prosecutor exceeded the proper bounds of opening statement and violated *Lambert* by indirect reference to the facts of the capital crime in opening statement;

---

1. The jury found the following aggravating circumstances: (1) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution, (2) the defendant was previously convicted of a felony involving the use or threat of violence to the person, and (3) there existed a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

2. In *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the Supreme Court held the execution of mentally retarded persons constitutes cruel and unusual punishment. In *Murphy v. State*, 2002 OK CR 32, ¶ 29, 54 P.3d 556, we recognized that in light of *Atkins*, mentally retarded persons are no longer eligible for the death penalty.

2. The prosecutor's irrelevant and improper statements about Petitioner's character in closing argument constituted reversible error;

3. The trial court improperly admitted irrelevant and prejudicial law enforcement opinion concerning Petitioner's mental functioning without a proper foundation;

4. The trial court improperly admitted irrelevant and prejudicial opinion testimony from a former prosecutor/current district judge concerning Petitioner's competency to testify;

5. The trial court improperly admitted irrelevant and prejudicial letters attributed to the Petitioner;

6. Evidence of Petitioner's use of verbal obscenities denied Petitioner a fair trial.

7. The trial court's instruction that mental retardation must be "present and known" before age 18 violated *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002);

8. The trial court erred by denying non-unanimous verdict forms to the jury;

9. The admission of irrelevant and prejudicial testimony about the murder investigation and from Petitioner's capital trial violated the strict relevancy limitations on such evidence required by *Lambert v. State* and *Atkins v. Virginia;*

10. The allocation of the burden of proof by a preponderance of the evidence to the Petitioner violates the Eighth Amendment and denies an adequate procedure for determining mental retardation;

11. The facts proven at trial showed Petitioner's mental retardation as a matter of constitutional law. The jury's verdict is contrary to the evidence and cannot stand.

The State, in its Supplemental Brief, submits the trial court followed proper procedure and properly instructed the jury and sufficient evidence supported the jury's determination that Howell is not mentally retarded.

¶5 In *Murphy v. State*, 2002 OK CR 32, ¶13, 54 P.3d 556, 567, we adopted the following definition of mental retardation for use in determining whether an individual is mentally retarded and therefore ineligible for the death penalty:

> A person is "mentally retarded": (1) If he or she functions at a significantly sub-average intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; (2) The mental retardation manifested itself before the age of eighteen (18) and (3) The mental retardation is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work.

> It is the defendant's burden to prove he or she is mentally retarded by a preponderance of the evidence at trial. Intelligence quotients are one of the many factors that may be considered, but are not alone determinative. However, no person shall be eligible to be considered mentally retarded unless he or she has an intelligence quotient of seventy or below, as reflected by at least one scientifically recognized, scientifically approved, and contemporary intelligent quotient test.

*Id.* (footnotes omitted).

¶6 In *Lambert v. State*, 2003 OK CR 11, ¶3, 71 P.3d 30, we stated a petitioner's criminal conviction and sentence of death were not relevant to the jury's determination of mental retardation and the jury "should not hear evidence of the crimes for which Lambert was convicted, *unless the particular facts of the case are relevant to the issue of mental retardation.* Any such evidence should be narrowly confined to that issue." (emphasis added). In his first claim of error, Howell contends the prosecutor exceeded the proper bounds of opening statement and violated *Lambert* by indirectly referring to the facts of the capital crime in her opening statement.

¶ 7 The purpose of opening statement is to tell the jury of the evidence the attorneys expect to present during trial. Its scope is determined at the discretion of the trial court. *Hammon v. State*, 1995 OK CR 33, ¶ 87, 898 P.2d 1287, 1306.

¶ 8 The prosecutor in this case talked about Howell's involvement in the criminal justice system, his incarceration and escape from a correctional facility, and his involvement in drug trafficking and in particular a drug deal gone awry. After the prosecutor mentioned Petitioner's escape from a correctional facility, Petitioner's counsel objected that the statement was beyond the proper scope of opening statement and the objection was properly overruled. The prosecutor was outlining the evidence which she intended to present at trial. Next Petitioner's counsel objected to the prosecutor's statement that Petitioner was part of a numbers racket. The trial court properly overruled this objection noting the prosecutor merely stated what Petitioner said during his own testimony. Counsel's last objection came after the prosecutor referred to Howell's testimony that "people get killed over dope and money." Counsel argued the prosecutor had indirectly referred to the facts of the capital crime—someone getting killed over drugs and money. This objection too was properly overruled as no specific mention of Howell's capital crime occurred and the prosecutor's statement was made to explain Howell's actions stemming from his involvement in cocaine distribution.

¶ 9 The trial court, upon counsel's objections, properly determined the prosecutor had not exceeded the proper scope of opening statement and had not exceeded the boundaries enunciated in *Lambert*. We find no error.

¶ 10 In his second claim, Howell contends the prosecutor's closing argument also violated *Lambert*. Counsel objected only after the prosecutor argued "[t]here's nothing illogical about Michael Wayne Howell. There's a lot that's been illegal about Michael Wayne Howell." The trial court overruled the objection "under the circumstances." The circumstances, as they appear in the record, show that the prosecutor's closing

argument, while referring to Howell's prior testimony and other evidence, was designed to illustrate how Howell's own statements and his writings showed he could communicate effectively and had the ability to learn from mistakes and to think logically. This argument was not improper. *Id.* It was offered in direct response to Howell's evidence of adaptive functioning deficits.

¶ 11 As to the propriety of the remainder of the prosecutor's closing argument, we review for plain error, because counsel made no further objections. *Harris v. State*, 2004 OK CR 1, ¶ 64, 84 P.3d 731, 754 (failure to object to prosecutor's closing argument waives all but plain error). Parties have wide latitude during closing argument to discuss the evidence and reasonable inferences from the evidence, and relief is required only where grossly improper and unwarranted argument affects a defendant's rights. *Hanson v. State*, 2003 OK CR 12, ¶ 13, 72 P.3d 40, 49. No grossly improper or unwarranted arguments appear in the record and we find no plain error warranting relief.

¶ 12 During the prosecutor's direct examination of Del City Police Officer Taylor, the prosecutor asked if, at any time during his investigation, he ever observed "anything that made you question his level of mental functioning?" Defense counsel objected as to lack of foundation and his objection was overruled. Officer Taylor responded "I—no, I did not." Then the prosecutor asked if it "ever occur[red] to you that he might be mentally retarded?" Officer Taylor responded, "No." In his third claim, Howell argues the trial court erred when it allowed Del City Police Officer Taylor to testify about his observations of Howell's level of mental functioning.

¶ 13 Admission of evidence is within the trial court's discretion, and will be disturbed only upon a showing of prejudice. *Hooks v. State*, 2005 OK CR 23, ¶ 13, 126 P.3d 636, 642. Opinion testimony of a lay witness is permissible under 12 O.S.2001, § 2701 when it is rationally based on the perception of the witness and is helpful to the determination of a fact in issue. *Littlejohn v. State*, 2004 OK CR 6, ¶ 35, 85 P.3d

287, 299, *cert. denied,* 543 U.S. 947, 125 S.Ct. 358, 160 L.Ed.2d 261 (2004). Officer Taylor's opinion and perception of Howell's level of mental functioning was properly admitted and the trial court did not abuse its discretion. Taylor's testimony was based upon his interactions with Howell and his observations of Howell's ability to communicate with Officer Taylor and others. His observation and lay opinion was relevant and helpful to the jury's determination of the first and third prongs of the definition of mental retardation as set forth in *Murphy*.

¶ 14 Howell also claims, in Proposition Four, that the trial court improperly admitted the opinion testimony of Judge Ray Elliott, a former prosecutor, concerning Howell's competency to testify at a hearing in 1988. The prosecutor asked, "And prior to him testifying, did his lawyers or anyone else ever express any concerns that he was not mentally capable of making the decision to testify?" Defense counsel objected on relevancy grounds and his objection was overruled. Judge Elliott responded, "No." When asked if he had any concerns in that regard, Judge Elliott responded, "No, none at all."

¶ 15 The trial court did not abuse its discretion in allowing this testimony. Judge Elliott's observation that neither Howell nor any of the attorneys involved in his 1988 criminal proceeding objected to his decision to testify on the grounds that he was not mentally capable of making that decision was relevant to the jury's determination of both the first and third prong of the definition of mental retardation as set forth in *Murphy*. *Hooks,* 2005 OK CR 23, ¶ 13, 126 P.3d at 642. From Judge Elliott's observation that no one objected to Howell's ability to testify or to make the decision to testify, a rational juror could properly infer Howell's counsel found him to be a competent witness.

¶ 16 Next, Petitioner claims the trial court erred when it admitted "irrelevant and prejudicial" letters written by Howell to Mona Lisa Watson, his co-defendant and former spouse. The admission of this evidence was within the discretion of the trial court and we find no abuse of discretion. *Hooks,* 2005 OK CR 23, ¶ 13, 126 P.3d at 642. State's Exhibits 9–12 were offered for the purpose of showing his ability to communicate, to understand and engage in logical reasoning, to show he understood the consequences of his actions and had the ability to learn from his mistakes, and to show he did not have deficits in social and interpersonal skills. The letters were properly admitted, and the State's reference to, and reading from, them in closing argument was within the proper boundaries of acceptable argument. *See Hanson,* 2003 OK CR 12, ¶ 13, 72 P.3d at 49 (parties have wide latitude in closing argument to discuss the evidence and reasonable inferences from the evidence). No relief is warranted on Proposition Five.

¶ 17 In his sixth claim, counsel for Petitioner argues that evidence of Petitioner's use of profanity denied him of a fundamentally fair jury trial on mental retardation. Counsel objected on three different occasions, noting that Howell's use of the "F" word, variations thereof, and the use of other cuss words were shocking to the sensibilities of the jury and were extremely prejudicial. The trial court properly overruled counsel's objections, noting the way he phrased his answers showed his contempt for the process and were demonstrative of his attitude and understanding of the proceedings. Howell's use of profanity in his everyday language, while unpleasant to hear, were not so prejudicial as to render his complete statements inadmissible. 12 O.S.Supp.2003, § 2403 (relevant evidence may be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice). The trial court did not abuse its discretion when it allowed the prosecutor to reference Howell's actual words in its examination of witnesses and closing argument and no relief is warranted on this claim. *Hooks,* 2005 OK CR 23, ¶ 13, 126 P.3d at 642.

¶ 18 In his seventh proposition, Howell claims the trial court's jury instruction that mental retardation must be "present and known" before age eighteen violated the standards enunciated in *Atkins*. In Proposition Eight, Howell claims the trial court erred when it refused to give the jury non-unanimous verdict forms.

¶ 19 We recently addressed both of these issues in *Myers*, 2005 OK CR 22, ¶¶ 12–16, 130 P.3d at 268–269. There, we upheld the use of the "present and known" language in the Oklahoma uniform jury instruction utilized by the trial court in this case. See OUJI–CR 2d. 4–68A (2003 Supp.). We also found that the requirement of a unanimous verdict did not violate *Atkins, Lambert,* or *Murphy* and in fact was required by the Oklahoma Constitution. Okla. Const. art.II, § 19; *Myers*, 2005 OK CR 22, ¶ 16, 130 P.3d at 269. The requirement of a unanimous verdict "neither increases the likelihood that a mentally retarded person will be executed nor does it force jurors to vote for a particular position" *Id.* We decline to revisit these claims here and no relief is required on either Proposition Seven or Proposition Eight.

¶ 20 In Proposition Nine, Howell argues the admission of irrelevant and prejudicial testimony about the murder investigation and from Petitioner's capital trial violated the strict relevancy limitations on such evidence required by *Lambert v. State* and *Atkins v. Virginia*. Howell complains about the admission of all of Judge Ray Elliott's testimony, Officer Phil Taylor's testimony, Mona Lisa Watson's testimony, and the admission of Howell's own testimony by videotape from his trial in 1988. Howell also complains about the admission of the letters he wrote to Mona Lisa Watson. We have already determined portions of Judge Elliott's testimony and Officer Taylor's testimony, relating to their observations that Howell did not appear to be mentally retarded, were properly admitted. Similarly, we found admission of the letters written by Howell to Watson was proper.

¶ 21 During the direct examination of Judge Elliott, the prosecutor asked him to read portions of Howell's direct examination from a court proceeding (his jury trial) held December 5, 1988 and to identify a videotape of portions of Howell's cross-examination

from that hearing. The videotape was then admitted as State's Exhibit 13 and was played for the jury.[3] Following admission of the videotape and after playing it for the jury, Judge Elliott was asked to read portions of Howell's testimony from a court proceeding held April 22, 1996. Defense counsel objected to Judge Elliott's reading of Howell's testimony and to the admission of State's Exhibit 13 on the grounds that the evidence was substantially more prejudicial than probative and that the testimony and evidence indirectly suggested Howell's commission of a capital offense. The trial court overruled the objections. The portions of Howell's testimony from the December 1988 hearing and from the April 1996 hearing which were read into the record are part of this record on appeal.[4]

¶ 22 The particular facts surrounding the capital crime for which Howell was convicted are inadmissible under *Lambert, "unless particular facts of the case are relevant to the issue of mental retardation."* (emphasis added) *Lambert*, 2003 OK CR 11, ¶ 3, 71 P.3d at 31. That evidence, if admitted, should be "narrowly confined" to the issue of mental retardation. *Id.* "If evidence bearing on mental retardation is available by transcript which was properly admitted in a previous proceeding," that evidence may be presented by transcript. *Id.*, 2003 OK CR 11, ¶ 3, n. 9, 71 P.3d at 31, n. 9.

¶ 23 Our decision in *Lambert* clearly envisioned that testimony from a prior proceeding might be admissible if it constituted evidence bearing on the issue of mental retardation. Here, the complained of evidence is Howell's own testimony and his own statements during an *in camera* hearing. We have completely reviewed the written transcripts and viewed the videotape. While much of the evidence was admissible, certain portions were not and were admitted in violation of *Lambert.*

---

3. Portions of Howell's testimony referencing his commission of capital murder were redacted from the videotape.

4. The Official Transcripts of Howell's testimony from proceedings held December 5, 1988 and April 22, 1996 are contained in the record on

appeal. *See* Order Granting Joint Motion to Supplement Post–Conviction Record and Order Directing Clerk to File Attachments 1 and 2 in Appeal Record, PCD 2003–268 (Okl.Cr. October 17, 2005)(not for publication).

¶ 24 Howell was originally tried for the murder of Charlene Calhoun in December of 1988. It was his direct examination from the 1988 jury trial which Judge Elliott read to the jury and the jury then viewed a portion of the State's cross-examination on State's Exhibit 13. Counsel's objections to both reading the transcript and playing the videotape were overruled. The record reflects the prosecutor and Judge Elliott read the first forty (40) pages of Howell's direct examination to the jury.[5] At the point in Howell's testimony where the confrontation between him and the victim Charlene Calhoun began, counsel objected again. At that point, the prosecutor, at the judge's suggestion, then moved to specific areas of the transcript so as to avoid specific references to the capital crime.

■ ¶ 25 In the first eleven (11) pages of Howell's testimony which was read to the jury, Howell testified about his involvement in a cocaine drug ring business. He testified about the operation of the business, told how it worked on a numbers racket, and how the drug deals took place. Howell testified about the man in charge of the drug business, described how the drugs and money were packaged, and how he was involved. Howell's testimony reflected his ability to respond directly to his counsel's questions and his responses were coherent and showed he could think and respond logically. The evidence of his involvement in the drug distribution ring, by way of his own testimony, while evidence of criminal conduct, was relevant to the issue of mental retardation, because it showed his ability to think rationally, to follow instructions, and to be responsible for large sums of money and drugs. *See Hooks*, 2005 OK CR 23, ¶ 17, 126 P.3d at 644 (evidence of petitioner's ability to run a continuing criminal enterprise was relevant to issue of mental retardation).

■ ¶ 26 The remainder, consisting of the specific drug deals leading up to his meeting with Charlene Calhoun, should not have been admitted. The portion of his testimony which explained how Calhoun was involved in the operation and which described their first cocaine exchange was of minimal relevance. But, more importantly, his testimony about the events leading up to their next meeting, his description of the elevated emotions surrounding the impending drug deal, and his description of the actual meeting with Calhoun suggested that serious criminal conduct followed. Howell testified

> She showed up. She said, "How you doing?" I said, "How you doing." I said, "You got the money?" She said, "Yeah, I got the money." She says, "I told you I had the money before I ever told you to come over here."

> I said, "Where's it at?" She said, "Where's the drugs?" I said, "I've got the drugs." I said, "You owe us $20,000. I'm here to get $20,000. When you give me the $20,000 and what we give to you in Ft. Smith last month, then I'll give you another kilo."

It was at that point, just before Howell's testimony would have revealed how the meeting escalated into a physical confrontation and his shooting of Calhoun, that counsel objected again and the trial court directed the prosecutor to skip to specific areas of the transcript. The prosecutor then skipped five (5) pages and began with this colloquy:

Q: Why did you take the car?

Howell: I already set the truck on fire. I knew I had to get out of there, you know. People was looking out the windows.

Q: Why did you burn the truck?

Howell: Because I was trying to cover up the evidence, my fingerprints, because I stole the truck and everything.

Q: When you were there, what time was it in the night, about 9:00? Do you recall?

Howell: Yeah, something around in there. I don't know what time it was.

Q: Were there lights around in these apartments right here?

Howell: Were there lights around there?

Q: Yes. Could you tell people were home?

---

5. The record shows the prosecutor and Judge Elliott read Howell's testimony from the 1988 jury trial from page 5 through page 44. (Tr. 613, 617)

Howell: Yeah, some of them was home, yes.

¶ 27 The prosecutor skipped over the questions about what Howell did with Calhoun's body, moved to the next page of the transcript and asked "If you had $60,000, why didn't you just unpack some of the money and buy a different car and lay low?

Howell: Because I don't mess with dope money. My partners told me straight up, don't touch it. . . .

Q: What did you think would have happened had you disturbed that money?

Howell: I wouldn't be here today. . . . This is for real, people you don't mess with. . . . You'll end up dead messing with people's money.

Howell then testified he went to Florida, stayed in a hotel, and stashed the money as instructed. The remainder of his direct examination was not read to the jury.

¶ 28 The portion of Howell's testimony referencing his contact with Charlene Calhoun and the events surrounding the drug deal with her, which led to her murder, should not have been admitted. While Howell's specific testimony that he shot her was not read to the jury, it was obvious from what was read that a serious crime had occurred. His testimony surrounding his meeting with Calhoun are so closely entwined with the actual facts of the crime, *i.e.* Howell shooting her, that this portion of his testimony should not have been admitted and was admitted in violation of *Lambert*.

¶ 29 Next we address the admission of State's Exhibit 13, a videotape of a portion of prosecutor Robert Macy's cross-examination of Howell at the 1988 trial. The beginning of the cross-examination was relevant to the issue of mental retardation. Because Howell waived his presence at the mental retardation jury trial, it was the jury's only opportunity to see Howell's demeanor and the way he communicated with the prosecutor. He answered the prosecutor's questions directly and coherently and was not evasive. At one point, he even attempted to joke with the prosecutor.

¶ 30 Approximately six minutes into the videotaped examination, the prosecutor began to ask questions relating to or referring to Charlene Calhoun. These questions might have been relatively innocuous had the jury not just heard Howell's direct examination testimony of the facts surrounding his meeting with Calhoun, his burning of her truck, and his subsequent flight to Florida. While there was no specific reference to Howell's murder of Charlene Calhoun, there was enough reference to the victim and to his conduct following her murder for the jury to piece together what happened. A portion of this videotape was admitted in violation of *Lambert*.

¶ 31 Finally, we address that portion of Judge Elliott's testimony where he read Howell's testimony from an in camera hearing held in 1996.[6] At this in camera hearing, Howell complained about having to attend the hearing and more importantly about his dissatisfaction with one of his attorneys and the way the State was handling his court proceedings. We note all references to life, life without parole and death were not read to the jury. From Howell's testimony at this *in camera* hearing, a rational jury could figure out that Howell understood the system well. He was obviously familiar with certain legal principles, and expressed his concerns rationally and coherently. His statements were relevant to the issue of mental retardation and showed he could understand and process information, communicate, engage in logical reasoning and understand the reactions of others. It suggested he does not have significant limitations in communication, social/interpersonal skills, self-direction, and use of community resources. We find no error in the trial court's admission of that portion of Judge Elliott's testimony which involved reading Howell's April 1996 testimony.

¶ 32 In *Atkins*, the Supreme Court observed that "[m]entally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Atkins*, 536 U.S. at 320–

---

6. Judge Elliott read Howell's testimony from the April 22, 1996 transcript, pages 7 through 16.

321, 122 S.Ct. at 2252. Those portions of Howell's prior testimony which were properly admitted suggest he was able to provide meaningful assistance to his counsel, clearly understood the proceedings, and was not a typically poor witness. His demeanor suggested a level of understanding inconsistent with mental retardation.

¶ 33 "The trial court's decision to admit evidence will not be disturbed absent a showing of abuse of discretion accompanied by prejudice." *Mitchell v. State*, 2005 OK CR 15, ¶ 38, 120 P.3d 1196, 1207. For evidentiary errors, the proper inquiry is whether this Court has "grave doubts" that the outcome of the trial would have been materially affected had the error not occurred. *Id.* The trial court abused its discretion when it admitted a significant portion of Howell's testimony from his trial in 1988 and allowed it to be read to the jury and when it admitted State's Exhibit 13. This evidence exceeded the parameters of admissible evidence relating to the crimes for which Howell was convicted as set forth in *Lambert*, 2003 OK CR 11, ¶ 3, 71 P.3d at 31.

¶ 34 However, reviewing the totality of the evidence presented, we have no grave doubts that the outcome of the trial would have been materially affected had the error not occurred. Even though the evidence went beyond the scope of *Lambert*, we conclude its admission was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Howell did not establish, by a preponderance of the evidence, that he is mentally retarded and even if the evidence admitted in violation of *Lambert* had not been admitted, the evidence still would not have supported a verdict that Howell is mentally retarded.

¶ 35 In his tenth proposition of error, Howell claims the allocation of the burden of proof by a preponderance of the evidence to the petitioner violated the Eighth Amendment and denied him of an adequate procedure for determining mental retardation. Prior to trial, Howell requested the trial court require the State to prove beyond a reasonable doubt that he is not mentally retarded. The trial court denied the motion and thereafter instructed the jury that it was Howell's burden to prove mental retardation by a preponderance of the evidence.

¶ 36 Howell claims the allocation of this burden to him violates *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) because mental retardation is a factual issue which must be determined by a jury prior to imposing the death penalty. In *Apprendi*, the Supreme Court held in a non-capital case that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362–2363. *Ring* extended the holding in *Apprendi* to capital cases. *Ring*, 536 U.S. at 609, 122 S.Ct. at 2443. Howell claims that under *Ring* and *Apprendi*, the determination that a petitioner is not mentally retarded must be proven by the State beyond a reasonable doubt.

¶ 37 The Oklahoma legislature has not conditioned an increase in a defendant's maximum punishment on the fact that he is not mentally retarded; the fact a defendant is not mentally retarded is not an aggravating circumstance which the State must prove beyond a reasonable doubt. 21 O.S.2001, § 701.12. Eligibility for the death penalty is a different issue than proof of an aggravating circumstance. Other states have addressed similar claims and have reached the same conclusion. *See State v. Laney*, 367 S.C. 639, 627 S.E.2d 726, 732 (2006)(concluding in post-*Atkins* cases, mental retardation is a threshold issue that determines whether a defendant is eligible for capital punishment at all); *People v. Smith*, 193 Misc.2d 462, 751 N.Y.S.2d 356, 357 (N.Y.Sup.2002)(upholding validity of statute requiring defendant to prove mental retardation as a mitigating circumstance by a preponderance of the evidence and rejecting contention that the prosecution should have an affirmative obligation to prove beyond a reasonable doubt the absence of any factor which would render the defendant ineligible for the death penalty); *State v. Williams*, 831 So.2d 835, 860, n. 35

(La.2002)(*Atkins* referred to mental retardation as an exemption from capital punishment, "not as a fact the *absence* of which operates as the 'functional equivalent of an element of a greater offense.'" Citations and quotations omitted.); *Howell v. State,* 151 S.W.3d 450, 466 (Tenn.2004)(mental retardation is a threshold issue that determines whether a defendant is eligible for capital punishment at all, not a statutory aggravating circumstance the lack of which must be proved by the State beyond a reasonable doubt); *In re Johnson,* 334 F.3d 403, 405 (5th Cir.2003)(per curiam)("neither *Ring* and *Apprendi* nor *Atkins* render the absence of mental retardation the functional equivalent of an element of capital murder which the State must prove beyond a reasonable doubt").

¶ 38 We continue to hold that in a post-conviction proceeding, when this Court has remanded for a jury determination on the factual issue of mental retardation, a petitioner must prove mental retardation by a preponderance of the evidence. *State ex. rel. Lane v. Bass,* 2004 OK CR 14, ¶ 8, 87 P.3d 629, 631–632; *Lambert,* 2003 OK CR 11, ¶ 4, 71 P.3d at 32; *Myers,* 2005 OK CR 22, ¶ 6, 130 P.3d at 265. Mental retardation is a complete bar to the imposition of the death penalty; it is different from a statutory aggravating circumstance which increases the punishment for an offense, and we conclude that the holdings in *Ring* and *Apprendi,* in our opinion, do not require the State to prove the lack of mental retardation beyond a reasonable doubt.

¶ 39 Further, we are not persuaded to restructure our procedure by the New Jersey Superior Court's holding in *State v. Jimenez,* 380 N.J.Super. 1, 880 A.2d 468 (A.D. 2005). The holding in *Jimenez* that the burden of proof should be on the State to prove a defendant's mental retardation is based upon that Court's interpretation of its own State Constitution and upon its public policy grounds. *Jimenez,* 880 A.2d at 489. Accordingly, Howell's tenth proposition is denied.

¶ 40 In his last claim of error, Howell submits the facts proven at trial showed he is mentally retarded as a matter of constitutional law, and the jury's verdict is contrary to the evidence and cannot stand.

¶ 41 To prove mental retardation, Howell was required to show, by a preponderance of the evidence, 1) that he functions at a significantly sub-average intellectual level that substantially limits his ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; 2) that his mental retardation manifested itself before the age of 18; and 3) that he has significant limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work. *Myers,* 2005 OK CR 22, ¶ 6, 130 P.3d at 266; *Murphy,* 2002 OK CR 32, ¶ 31, 54 P.3d at 567–568. The issue of mental retardation is a factual issue which was resolved by the jury, and we afford the jury's decision great deference. *Myers,* id. at ¶ 7, 130 P.3d at 266–267. We will not disturb a jury's verdict where there is any competent evidence reasonably tending to support it. *Id.* When a defendant/petitioner challenges the sufficiency of the evidence following a jury's verdict that he or she is not mentally retarded, this Court will review the evidence in a light most favorable to the State to determine if any rational trier of fact could have reached the same conclusion. *Id.*

¶ 42 Applying this standard of review to the present case, we find the record supports the jury's verdict that Howell is not mentally retarded. Howell was administered various intelligence tests over the years and his scores ranged from 62 to 91. Howell's scores on tests administered by his expert, Dr. Grant, ranged from 62 to 73.[7] Dr. Grant also administered various academic and adaptive functioning tests and concluded Howell's results on those tests were consistent with his

---

7. Dr. Grant administered the Wechsler Adult Intelligence Scales—3rd Edition (WAIS–3), the Stanford Binet Intelligence Scale—4th Edition

(SB–4), and the Comprehensive Test of Non-Verbal Intelligence (CTONI).

IQ performances. He testified Howell is mentally retarded and has significantly sub-average general intellectual functioning and significantly impaired adaptive skills.

¶ 43 Howell's sister Brenda testified that as one of nine children, Howell was raised in an environment of extreme poverty. Although she was three years younger than Howell, she said she had to help him dress from the time she was about five years old. She said he had difficulty with speech and she often could not understand what he was saying. She said she taught Howell his ABCs when he was nine.

¶ 44 Howell's brother David testified that as children, they often had no food to eat. He said they lived in extreme poverty. David said he and Michael attended school in the same grade and were in special education classes. David said other children made fun of them and called them retarded because they were in special education classes. David said the other children called them "flag boys" because they made "F"s. David said Michael had several jobs. He worked for his father's garbage service picking up garbage, for Ross Metals loading batteries onto a conveyor belt, and for Gene Carnell as a laborer. David said he never knew of a time when Michael lived alone.

¶ 45 The State's expert, Dr. John Hutson, did not find Howell mentally retarded. Although Howell scored a 62 on the WAIS–III administered by Dr. Hutson, Dr. Hutson was uncomfortable with the level of effort Howell put into the test. He said Howell's scores were simply not consistent with his presentation in talking and interacting. During his evaluation, Howell responded appropriately, without difficulty, and fairly rapidly to questions. Although Dr. Hutson did not think Howell was malingering, he thought Howell acted like he did not care and did not put forth his best effort on the tests. Dr. Hutson thought with his best efforts, Howell's minimal IQ score would be near 80. He based that opinion on his interactions and conversations with Howell and upon his review of Howell's conversation with Judge Freeman in 1996 when Howell wanted to discharge one of his attorneys and to be absent from the courtroom. In the exchange with Judge Freeman, Dr. Hutson noted Howell expressed concern about his injured leg and was able to communicate objectives in multi-syllabic words, communicate ideas, and make cogent arguments.

¶ 46 Dr. Hutson also noted Howell's use of community resources where Howell requested sentence reduction or commutation by written correspondence which contained reasonable arguments. He achieved a welding certification and received a commendation for his work activities while incarcerated in Wyoming. Dr. Hutson testified Howell's ability to escape successfully from incarceration showed his intellectual ability. Dr. Hutson stated he had not seen any evidence that Howell was in special education classes while attending school as a child. Dr. Hutson said Howell did not suffer from significant limitations in social skills (noting Howell fared well in his social scene as a drug user and that he was married), communication skills, self-care, work, and use of community resources.

¶ 47 The evidence presented at the trial shows Howell did not meet even the first prong of the definition of mental retardation. *Murphy,* 2002 OK CR 32, ¶ 31, 54 P.3d at 567. Although Howell presented evidence he obtained IQ scores lower than 70 on a couple of occasions, his effort on those tests was questionable. The jury could properly consider Howell's scores above 70 and conclude he functioned at a higher level. An IQ score of 70 or below alone is not determinative of mental retardation. *See Pickens v. State,* 2005 OK CR 27, ¶ 14, 126 P.3d 612, 616 (other evidence of low intellectual functioning may be considered in determining whether someone has sub-average intellectual ability which limits one's ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses and to understand the reactions of others). Other evidence, besides the testing scores, suggested that Howell was not limited in his abilities to understand and process information, not limited in communications skills, was able to learn from experiences or mistakes, was able to engage in logical reasoning, and was able to understand the reactions of others.

¶ 48 The school records which were admitted at trial show Howell made poor and often failing grades; however, these records do not show he was identified as in need of special education. School records of his siblings Brenda and David were admitted and their records show they were identified as special education students. From this evidence, the jury could have concluded his siblings were in special education, but Howell was not. The jury might also have found Howell's poor academic performance during the time he attended school was due to lack of effort, absences, or environmental factors rather than lack of ability.

¶ 49 His hand-written letters to Mona Lisa Watson show he communicated well in writing; he could understand and process information, learn from experience or mistakes, engage in logical reasoning and understand the reactions of others. The fact that he wrote these letters showed he was able to maintain a relationship with Watson and were reflective of his social/interpersonal skills.

¶ 50 The portions of Howell's testimony from the prior hearings which were properly admitted also illustrate Howell does not function at a significantly sub-average level. His trial testimony from 1988 showed he could understand and process information, communicate, engage in logical reasoning, and understand the reactions of others. His exchange with Judge Freeman in 1996 about his broken leg, about discharging his attorney, and about remaining at the court proceedings reflected his ability to understand and process information, communicate, engage in logical reasoning, and understand the reactions of others.

¶ 51 The admissible evidence, viewed in a light most favorable to the State, showed Howell did not function at a significantly sub-average level that substantially limited his abilities to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others. *See Myers*, 2005 OK CR 22, ¶ 7, 130 P.3d 262 (when a defendant challenges the sufficiency of the evidence following a jury finding that he/she is not mentally retarded, this Court will review the evidence in a light most favorable to the State). Even though some evidence relating to the crimes Howell committed was improperly admitted, we find this evidence did not contribute to the jury's verdict, and its admission was harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828. Howell did not establish, by a preponderance of the evidence, that he is mentally retarded and even if the evidence admitted in violation of Lambert had not been admitted, the evidence still would not have supported a verdict that Howell is mentally retarded.

**DECISION**

¶ 52 Howell's Second Application for Post–Conviction Relief in a Death Penalty Case is ***DENIED*** and his sentence of death is ***AFFIRMED***. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2006), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

CHAPEL, P.J., A. JOHNSON and LEWIS, JJ., concurs.

LUMPKIN, V.P.J., concurs in results.

LUMPKIN, V.P.J., concurs in result.

¶ 1 I concur in the result reached by this case and find no error in the evidence, including the portion of Howell's testimony regarding Charlene Calhoun that was read to the jury, or law that would warrant post-conviction relief. I find the Court's speculation the jury knew, or might have inferred, more than the evidence shows they were informed regarding the murder is not supported by the evidence the jury actually received. However, as for the procedures used by the Court in adjudicating the issue of mental retardation, I concur only by reason of *stare decisis* for the same reasons set forth in my writings in *Myers v. State*, 2005 OK CR 22, 130 P.3d 262; *Lambert v. State*, 2003 OK CR 11, 71 P.3d 30; and *State, ex rel. Lane v. Bass*, 2004 OK CR 14, 87 P.3d 629.